# EXHIBIT

# A

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

Original – Court

| STATE OF MICHIGAN<br>6TH JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | NOTICE OF ASSIGNMENT TO THE<br>BUSINESS COURT | CASE NO.<br>2025-219566-CB<br>2025 JUDGE VICTORIA<br>VALENTINE - CB |
|---|---|---|

**Court address**
1200 N Telegraph Rd  Pontiac, MI  48341

Court telephone no.
248-858-0345

| Plaintiff's name(s), address(es), and telephone number(s)<br>PXI AUTOMOTIVE MEXICO S de R.L. de CV,<br>a Mexican corporation, | v | Defendant's name(s), address(es), and telephone number(s)<br>AIR INTERNATIONAL (US), INC.<br>a Michigan corporation, |
|---|---|---|
| Plaintiff's attorney, bar no., address, telephone no., and email address<br>James E. DeLine (P45205), Michael Sneyd (P52073)<br>KERR, RUSSELL AND WEBER, PLC, 500 Woodward,<br>Ste. 2500 Detroit, MI 48226, (313) 961-0200<br>jdeline@kerr-russell.com, msneyd@kerr-russell.com | | Defendant's attorney, bar no., address, telephone no., and email address |

The ☑ Plaintiff ☐ Defendant requests assignment of the above captioned matter to the Business Court. The case qualifies for the Business Court and the matter should be identified as Business Court eligible pursuant to MCL 600.8031, MCL 600.8035, and LAO 2024-01 as indicated below. (Check all that apply.)

The case qualifies as business or commercial dispute as defined by MCR 2.112(O) and MCL 600.8031(1)(c)(i)-(iii) as:

☑ All of the parties are business enterprises;

☐ One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members of a limited liability company or similar business organization, directors, officers, agents, employees, suppliers, guarantors of a commercial loan, or competitors, and the claims arise out of those relationships;

☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances.

Pursuant to MCL 600.8031(2) the business or commercial dispute includes, but is not limited to, those involving:

☐ The sale, merger, purchase, combination, dissolution, liquidation, organizational structure, governance, or finance of a business enterprise;

☐ Information technology, software, or website development, maintenance or hosting;

☐ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;

☑ Contractual agreements or other business dealings, including licensing, trade secret, intellectual property, antitrust, securities, noncompete, nonsolicitation, and confidentiality agreements if all available administrative remedies are completely exhausted, including, but not limited to, alternative dispute resolution processes prescribed in the agreements;

☐ Commercial transactions, including commercial bank transactions;

☐ Business or commercial insurance policies; and/or

☐ Commercial real property.

☐ Other: (Please explain)

December 11, 2025
Date

/s/ Michael A. Sneyd
Name

Attorney for: PXI AUTOMOTIVE MEXICO S de R.L. de CV

OCBC 01 (3/24) **NOTICE OF ASSIGNMENT TO THE BUSINESS COURT**

FILED  Received for Filing  Oakland County Clerk  12/11/2025 2:13 PM

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

Approved, SCAO

| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>6th  **JUDICIAL CIRCUIT**<br>**COUNTY** | **SUMMONS** | **CASE NUMBER**<br>2025-          -CB |
|---|---|---|

| Court address<br>1200 N Telegraph Rd Pontiac, MI 48341 | Court telephone number<br>248-858-0345 |
|---|---|

| Plaintiff's name, address, and telephone number<br>PXI AUTOMOTIVE MEXICO S de R.L. de CV | v | Defendant's name, address, and telephone number<br>AIR INTERNATIONAL (US), INC.<br>750 Standard Pkwy,<br>Auburn Hills, MI 48326-1448 |
|---|---|---|

Plaintiff's attorney bar number, address, and telephone number

James E. DeLine (P45205), Michael Sneyd (P52073)
KERR, RUSSELL AND WEBER, PLC, 500 Woodward, Ste. 2500
Detroit, MI 48226, (313) 961-0200
jdeline@kerr-russell.com, msneyd@kerr-russell.com

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the c̶_____with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family divisi_____cuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of th_____ision of the circuit court involving the family or family members of the person(s) who are the subject of th_____ have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the juri_____e family division of the circuit court involving the family or family members of the person(s) who are the subj_____mplaint.

**Civil Case**

☑ This is a business case in which all or part of the action_____business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a_____r expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if_____e contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil act_____t of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or ot_____arising out of the transaction or occurrence alleged in the complaint has

been previously filed in   ☐ this c_____ Court, where

it was given case number _____ and assigned to Judge _____

The action   ☐ remain_____nger  pending.

Summons section complete_____clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| | Important: This summons is not issued. Resubmit as a separate document. | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (3/23)   **SUMMONS**                                        MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105
SRA

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PXI AUTOMOTIVE MEXICO S de R.L. de CV,
a Mexican corporation,

                                     2025-219566-CB

Plaintiff,

                                     JUDGE VICTORIA VALENTINE

v.

                                  Case No. 2025 _____-CB

AIR INTERNATIONAL (US), INC.,
a Michigan corporation,

Defendant.

_____/

James E. DeLine (P45205)
Michael Sneyd (P52073)
KERR, RUSSELL AND WEBER, PLC
Attorneys for Plaintiff
500 Woodward Ave., Ste. 2500
Detroit, MI 48226-3406
(313) 961-0200
jdeline@kerr-russell.com
msneyd@kerr-russell.com
_____/

## **COMPLAINT**

        Plaintiff, PXI AUTOMOTIVE MEXICO S de R.L. de CV, a Mexican corporation ("PXI"

or "Plaintiff"), by and through its undersigned counsel, KERR, RUSSELL AND WEBER, PLC,

hereby files this Complaint against Defendant, AIR INTERNATIONAL (US), INC., a Michigan

corporation ("AIUS" or "Defendant") (collectively with PXI, the "Parties").  For its causes of

action, PXI states the following:

## **NATURE OF THE CONTROVERSY**

        1.     PXI, an automotive parts supplier, brings this action to recoup millions of dollars

in investments and losses incurred due to the failure of AIUS to honor its commitments.

2.     As set forth herein, PXI and AIUS entered into multiple requirements contracts for the supplying of automotive parts and AIUS was to issue certain amounts of purchase orders in connection with these contracts.

3.     In reliance on AIUS's commitment to purchase substantial volumes of auto parts over a multi-year period, PXI invested substantial sums in infrastructure and to acquire machinery to manufacture the parts.

4.     Despite this, the volume of parts AIUS actually ordered has been far less than what it committed to purchase, resulting in substantial losses incurred by PXI.

5.     As a direct and proximate result of AIUS's multiple breaches of its contractual obligations, PXI has suffered damages reasonably believed to be in excess of $2 million.

6.     AIUS's actions, as aforesaid, constitute a breach of its contractual obligations to Plaintiff.  Alternatively, if this court determines that contractual relief is not available, Plaintiff contends that Defendant is liable to Plaintiff under a promissory estoppel theory of recovery.

## PARTIES

7.     Plaintiff PXI is a foreign corporation organized under the laws of the country of Mexico with its principal place of business located in Querétaro, Mexico.

8.     Defendant AIUS is a corporation organized under the laws of Michigan, with its principal place of business in Auburn Hills, Oakland County, Michigan.

9.     The amount in controversy exceeds $25,000, exclusive of interest, costs and attorneys' fees.

## GENERAL ALLEGATIONS

10.     PXI is a company that, among other things, manufactures and supplies various auto heat system parts to its customers.

11.     AIUS is a company that, among other things, supplies auto heat system parts to its

customers, including parts purchased from other manufacturers and suppliers, such as PXI.

12. As set forth below, PXI and AIUS entered into multiple requirements contracts whereby PXI was to supply various parts to AIUS as specified in their agreements.

13. The Parties consummated their agreements through Letter of Intent contracts. Thereafter, AIUS was to place Purchase Orders with PXI which also incorporated standard Purchase Order Terms and Conditions.

14. Specifically, the Purchase Orders were to also include the terms set forth in Air International document USPUPD0031 Purchase Order Terms and Conditions (the "Terms and Conditions"). Upon information and belief, a true and correct copy of the Terms and Conditions is attached hereto as **Exhibit 1.**

15. The Terms and Conditions provide, in pertinent part, as follows:

> 2. *TERM.*
>
> *Unless otherwise expressly provided in this Order or in any other written agreement between Buyer and Supplier, the term of this Order (the "Term") is the period commencing on the date set forth on the Order and continuing through the end of the vehicle platform(s) for which such Goods are supplied, including any extensions thereof.*
>
> . . . .
>
> 25 *TERMINATION FOR BREACH, NON-PERFORMANCE, SALE OF ASSETS, OR CHANGE IN CONTROL*
>
> *(a) Supplier acknowledges that, in entering into the Order, AIR shall become entirely dependent upon Supplier for the timely development and production of samples and prototypes of the goods, for the supply of the goods, and, as a result, for the production by AIR of its vehicles in accordance with the schedules contemplated in this Order. Supplier further recognizes that failure to timely and fully perform its obligations hereunder may affect the viability of the manufacturing of the vehicles . . .*
>
> . . . .
>
> 37. *CUSTOM EXPORT CONTROLS*

*. . . . If AIR is responsible for customs duties, it will be responsible for normal duties only. Supplier will be responsible for any special duties, including but not limited to, marking, anti-dumping and countervailing duties, to the extent permitted under the law of the country of importation. . . .*

## COUNT I
### (Breach of P2 Agreement – Insufficient Volumes)

16.     Plaintiff incorporates paragraphs 1 through 15 above as and for paragraph 16 of this count.

17.     In or around February, 2021, PXI and AIUS executed a Letter of Intent (LOI) for HVAC – Inner Condenser Pipe contract (the "P2 Agreement"). A true and correct copy of the P2 Agreement is attached hereto as **Exhibit 2**.

18.     In the P2 Agreement, the Parties contracted for PXI to be the series supplier to AIUS for auto parts associated with the GL091571 Project P2 Aux HVAC. Stated differently, the Parties contacted for PXI to supply AIUS with the following auto parts:

- Part No. P101571088 (Inner Condenser Pipe Asm); and

- Part No. H111571087 (Evap Pip Sub Asm).

19.     The P2 Agreement provides, in pertinent part, as follows:

*Subject to the General Terms and Conditions . . . (AIUS) has selected <u>PXI Automotive</u> as the supplier for the <u>Inner Condenser Pipe Asm AND Evap Pipe Sub Asm</u> in connection with the <u>GL091571 Project P2 AUX HVAC.</u> The Purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier. . . .*

*          . . . .*

*Agreed tooling costs [\$31,500.00 for Inner Condenser Pipe Asm and \$21,500.00 for Evap Pipe Sub Asm] will be reimbursed by AIUS, as follows: 100% PPAP Approval.*

**(Exhibit 2)**

20.     Following execution of the P2 Agreement, and in reliance on AIUS's promises and

obligations set forth therein, PXI expended the $63,000.00 in tooling costs as identified above so as to mobilize its production capabilities.

21.    The P2 Agreement contained a chart entitled "Project P2 HVAC North America Estimated Volume" which estimated annual production of parts for 96,000 vehicles, weekly production for 2,000 vehicles, and daily production for 400 vehicles. *Id.* The P2 Agreement further set forth that, at the time of contracting, the per piece price for the Inner Condenser Pipe Asm was $5.6604 and the per piece price of the Evap Pipe Sub Asm was $4.8260, and that the pricing was subject to changes based on exchange rate and raw materials cost, among other things.

22.    At an annual volume of 96,000 vehicles, the total, unadjusted charges for the two parts was as follows: $543,398.40 for the Inner Condenser Pipe Asm and $463,296.00 for the Evap Pipe Sub Asm.  The total initial annual estimated charges for the sales of these two parts was $1,006,694.40.

23.    The annual estimated charges set forth above were premised on the fact that the volume of parts that AIUS was to purchase from PXI was at or near the annual estimated amounts. PXI would not and could not quote similar pricing for significantly reduced purchase amounts as the costs to mobilize would be cost prohibitive to it.

24.    In reliance on these estimates, PXI manufactured substantial amounts of the required parts so as to have inventory available for AIUS.  PXI further incurred substantial tooling costs and costs to acquire machinery in connection with manufacturing the required parts for AIUS under their agreement.

25.    Despite the annual volumes set forth above, after executing the P2 Agreement, AIUS drastically reduced the volumes of parts it ordered under the P2 Agreement.  To wit, for the annual period commencing in April, 2024, AIUS purchased 7,248 units of Part No. H111571087

and 10,560 units of Part No. P101571088, numbers that were drastically lower than the annual amounts.

26.     The P2 Agreement is a valid, binding and enforceable requirements contract between PXI and AIUS.

27.     PXI has fully performed all of its material obligations due under the P2 Agreement and has otherwise satisfied its contractual obligations to AIUS.

28.     The P2 Agreement is a "contract for the sale of goods" governed by Article 2 of the Michigan Uniform Commercial Code, MCL 440.2101 et seq.

29.     Under MCL 440.2306, a term which measures the quantity by the requirements of the buyer means such requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimated may be demanded.

30.     By drastically reducing its orders for the parts identified in the P2 Agreement, AIUS demanded quantities of PXI parts that were unreasonably disproportionate to its stated annual estimates.

31.     Additionally, despite representing that it would purchase certain quantities of parts from PXI, AIUS sourced parts from other manufacturers.

32.     AIUS also failed and refused to reimburse PXI for normal and customary importation tariffs imposed by Mexico and VAT charges, and has failed and refused to pay PXI for parts that it purchased.

33.     In light of the foregoing actions, AIUS willfully and materially breached the P2 Agreement.

34.     As a direct and proximate result of AIUS's breach of the P2 Agreement, PXI has suffered damages in excess of $25,000 and reasonably believed to be in excess of hundreds of

thousands of dollars.

35.     Pursuant to its rights under the Michigan Uniform Commercial Code, in light of AIUS's breach, PXI may also immediately withhold delivery of goods and cancel the P2 Agreement.

## COUNT II
### (Breach of P2 Agreement – Failure to Pay Invoices)

36.     Plaintiff incorporates paragraphs 1 through 35 above as and for paragraph 36 of this count.

37.     PXI delivered conforming goods to AIUS and AIUS accepted the goods without objection.

38.     AIUS has willfully and materially breached the P2 Agreement by failing to pay the contract price for the accepted goods as well as other costs associated with these goods including normal and customary tariff and VAT charges.

39.     AIUS has failed to act in good faith in its performance of its obligations under the P2 Agreement.

40.     As a direct and proximate result of AIUS's breach of the P2 Agreement, PXI has suffered damages in excess of $25,000, and reasonably believed to be in excess of hundreds of thousands of dollars.

41.     Pursuant to its rights under the Michigan Uniform Commercial Code, in light of AIUS's breach, PXI may also immediately withhold delivery of goods and cancel the P2 Agreement.

## COUNT III
### (Breach of P708 Agreement – Insufficient Volumes)

{80000/317/D2079695.DOCX;1}

42.     Plaintiff incorporates paragraphs 1 through 41 above as and for paragraph 42 of this count.

43.     In or around July, 2021, PXI and AIUS executed a Letter of Intent (LOI) for Pipes (the "P708 Agreement").  A true and correct copy of the P708 Agreement is attached hereto as **Exhibit 3**.

44.     In the P708 Agreement, the Parties contracted for PXI to be the series supplier to AIUS for auto parts associated with the PIPES ON P708 PROGRAM.  Stated differently, the Parties contracted for PXI to supply AIUS with the following auto parts:

- P181595040 (Oil Pipe Inlet Asm);

- P181595041 (Oil Pipe Outlet Asm);

- P181595057 (Oil Pipe Inlet Asm);

- P181595060 (Oil Pipe Inlet Asm);

- P181595062 (Oil Pipe Outlet Asm); and

- P181595064 (Oil Pipe Outlet Asm).

45.     The P708 Agreement provides, in pertinent part, as follows:

> *Subject to the General Terms and Conditions . . . (AIUS) has selected PXI AUTOMOTIVE MEXICO as the supplier for the PIPES ON P708 PROGRAM. The Purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier. . . .*
>
> . . . .
>
> *Agreed tooling costs [between $9,850.00 and $9,900.00 per part for each of six identified parts] will be reimbursed by AIUS, as follows: 100% PPAP Approval.*

**(Exhibit 3)**

46.     Following execution of the P708 Agreement, and in reliance on AIUS' promises and obligations set forth therein, PXI expended $59,220.00 in tooling costs as identified above so

as to mobilize its production capabilities.

47.     The P708 Agreement contained a chart identifying part numbers and initial pricing for each part.  The P708 Agreement contained another chart entitled "FM091595 FORD P708 AUBURN HILLS MICHIGAN" which set forth the annual volume of each of these six-part numbers.  The initial pricing and annual quantities for each of these parts was set forth as follows:

| Part No. | Piece Price | Annual Volume | Total Initial Cost |
|---|---|---|---|
| P181595040 | $1.643 | 99,284 | $163,123.61 |
| P181595041 | $1.353 | 99,284 | $134,331.25 |
| P181595057 | $1.684 | 88,389 | $148,847.08 |
| P181595060 | $1.723 | 115,025 | $198,188.08 |
| P181595062 | $1.704 | 88,389 | $150,614.86 |
| P181595064 | $1.823 | 115,025 | $209,609.58 |
| | | | $1,004,714.46 |

48.     The P708 Agreement further provided that "Supplier should be able to support 15% above quoted capacity."  In other words, at the time of contracting, PXI was to be able to supply to AIUS 15% more than each of the annual volumes set forth in the above chart.

49.     The annual estimated charges set forth above were premised on the fact that the volume of parts that AIUS was to purchase from PXI was at or near the stated annual volumes. PXI would not and could not quote similar pricing for significantly reduced purchase volumes as the costs to mobilize would be cost prohibitive to it.

50.     Despite the annual volumes set forth above, AIUS drastically reduced the volumes of parts it ordered under the P708 Agreement.  To wit, AIUS only ordered the following total volumes of parts for the duration of the P708 Agreement:

| Year/ Part No | P181595040 | P181595041 | P181595057 | P181595060 | P181595062 | P181595064 |
|---|---|---|---|---|---|---|
| 2022 | 6,480 | 1,725 | 156 | 1,664 | 1,792 | 2,160 |
| 2023 | 42,630 | 46,698 | 83,322 | 94,362 | 86,704 | 94,104 |
| 2024 | 228,825 | 239,756 | 93,696 | 84,215 | 84,708 | 84,692 |
| 2025 | 88,560 | 77,175 | 37,080 | 43,065 | 45,360 | 38,340 |

| Total Qty. | 366,495 | 365,354 | 214,254 | 223,306 | 218,564 | 219,296 |
| Annual Avg. | 91,624 | 91,339 | 53,564 | 55,827 | 54,641 | 54,824 |

These numbers are significantly less than the agreed upon average annual volumes.

51.     The P708 Agreement is a valid, binding and enforceable requirements contract between PXI and AIUS.

52.     The P708 Agreement is a "contract for the sale of goods" governed by Article 2 of the Michigan Uniform Commercial Code, MCL 440.2101 et seq.

53.     Under MCL 440.2306, a term which measures the quantity by the requirements of the buyer means such requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimated may be demanded.

54.     By drastically reducing its orders for the parts identified in the P708 Agreement, AIUS demanded quantities of PXI parts that were unreasonably disproportionate to their stated annual estimates.

55.     Additionally, despite representing that it would purchase certain quantities of parts from PXI, AIUS sourced parts from other manufacturers.

56.     AIUS also failed and refused to reimburse PXI for normal and customary importation tariffs imposed by Mexico and VAT charges, and has failed and refused to pay PXI for parts that it purchased.

57.     In light of the foregoing actions, AIUS willfully and materially breached the P708 Agreement.

58.     As a direct and proximate result of AIUS's breach of the P708 Agreement, PXI has suffered damages in excess of $25,000, and reasonably believed to be in excess of hundreds of thousands of dollars.

59.     Pursuant to its rights under the Michigan Uniform Commercial Code, in light of

AIUS's breach, PXI may also immediately withhold delivery of goods and cancel the P708 Agreement.

## COUNT IV
### (Breach of P708 Agreement – Failure to Pay Invoices)

60.     Plaintiff incorporates paragraphs 1 through 59 above as and for paragraph 60 of this count.

61.     PXI delivered conforming goods to AIUS and AIUS accepted the goods without objection.

62.     AIUS has willfully and materially breached the P708 Agreement by failing to pay the contract price for the accepted goods as well as other costs associated with these goods including normal and customary tariff and VAT charges.

63.     AIUS has failed to act in good faith in its performance of its obligations under the P708 Agreement.

64.     As a direct and proximate result of AIUS's breach of the P708 Agreement, PXI has suffered damages in excess of $25,000, and reasonably believed to be in excess of $75,000.

65.     Pursuant to its rights under the Michigan Uniform Commercial Code, in light of AIUS's breach, PXI may also immediately withhold delivery of goods and cancel the P708 Agreement.

## COUNT V
### (Promissory Estoppel – Alternative to Counts I through IV)

66.     Plaintiff pleads Count V as an alternative to Counts I through IV above.

67.     Plaintiff incorporates paragraphs 1 through 65 above as and for paragraph 67 of this count.

68.     As part of the P2 and P708 Agreements, AIUS promised to purchase parts from

PXI in or around the estimated amounts set forth in those agreements. With the understanding that pricing was based on the stated estimated volumes, PXI set pricing for the parts.

69.     AIUS further promised to reimburse PXI for tariffs and VAT imposed on PXI in connection with the selling of the subject parts.

70.     PXI reasonably relied on AIUS's representations and promises regarding sales volume, including setting its prices based on the anticipated sales volume.

71.     AIUS's promises to purchase parts from PXI in the specified volumes was illusory because AIUS's orders were substantially less than the volumes set forth in the Parties' agreements. The diminished purchases were further exacerbated by AIUS's purchasing of similar parts from other manufacturers.

72.     PXI relied on AIUS's representations and promises to its detriment and, as a result, has sustained damages in excess of $25,000, and reasonably believed to be well in excess of hundreds of thousands of dollars.

73.     To avoid injustice, this Court should specifically enforce AIUS's promise to purchase enumerated amounts from PXI and to compensate PXI for other related damages it has incurred as a result of AIUS's actions.

## COUNT VI
### (Breach of GE2 Contract)

74.     Plaintiff incorporates paragraphs 1 through 73 above as and for paragraph 74 of this count.

75.     In or around October, 2021, PXI and AIUS executed a Letter of Intent (LOI) for the PIPES ON FM091537 Ford GE2 Program (the "GE2 Agreement"). A true and correct copy of the GE2 Agreement is attached hereto as **Exhibit 4**.

76.     In the GE2 Agreement, the Parties contracted for PXI to be the series supplier to

AIUS for auto parts associated with the PIPES ON GE2 PROGRAM. Stated differently, the

Parties contacted for PXI to supply AIUS with the following auto parts:

- Part No. H321537021 (Pipe Heater Inlet;

- Part No. H321537022 (Pipe Heater Outlet);

- Part No. H321537023 (Pipe – Evaporator Inlet); and

- Part No. H321537024 (Pipe Evaporator Outlet).

77.    The GE2 Agreement provides, in pertinent part, as follows:

> *Subject to the General Terms and Conditions . . . (AIUS) has selected PXI AUTOMOTIVE MEXICO as the supplier for the PIPES ON FM091537 FORD GE2 PROGRAM. The Purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier. . . .*
>
> . . . .
>
> *Agreed tooling costs will be reimbursed by AIUS, as follows: 100% PPAP Approval.*

**(Exhibit 4)**

78.    Following execution of the GE2 Agreement, and in reliance on AIUS' promises

and obligations set forth therein, PXI expended $46,996.00 in tooling costs as identified above so

as to mobilize its production capabilities.

79.    The GE2 Agreement contained a chart identifying the above-referenced part

numbers and initial pricing for each part. The GE2 Agreement contained another chart entitled

"FM091537 FORD GE2 PUEBLA MECXICO" which set forth an annual volume of 100,000 for

each of the four identified parts.

80.    The GE2 Agreement further provided that "Supplier should be able to support 15%

above quoted capacity." In other words, at the time of contracting, PXI was to be able to supply

to AIUS 15% more than each of the annual volumes set forth in the above chart.

81.     Despite the annual volumes set forth above, AIUS never ordered any parts from PXI under the GE2 Agreement.  Instead, shortly after PXI incurred tooling and other costs, AIUS informed PXI that it was cancelling the GE2 Agreement.

82.     The GE2 Agreement was a valid, binding and enforceable requirements contract between PXI and AIUS.

83.     The GE2 Agreement is a "contract for the sale of goods" governed by Article 2 of the Michigan Uniform Commercial Code, MCL 440.2101 et seq.

84.     Under MCL 440.2306, a term which measures the quantity by the requirements of the buyer means such requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimated may be demanded.

85.     By ordering zero parts and then unilaterally cancelling the GE2 Agreement, the volume of parts actually ordered by AIUS was unreasonably disproportionate to AIUS' stated annual estimates.

86.     In light of the foregoing actions, AIUS willfully and materially breached the GE2 Agreement.

87.     As a direct and proximate result of AIUS's breach of the GE2 Agreement, PXI has suffered damages in excess of $46,000.

## COUNT VII
### (Breach of CD390 Contract)

88.     Plaintiff incorporates paragraphs 1 through 87 above as and for paragraph 88 of this count.

89.     In or around January 20, 2020, PXI and AIUS executed a Letter of Intent (LOI) for Ford CD390/539 Pipes (the "CD390 Agreement").   A true and correct copy of the CD390 Agreement is attached hereto as **Exhibit 5**.

90.   In the CD390 Agreement, the Parties contracted for PXI to be the series supplier to AIUS for auto parts associated with the Ford CD390/539 Pipes.  Stated differently, the Parties contracted for PXI to supply AIUS with the following auto part numbers:

- Part No. P09_1539_105 (Pipe Inlet);

- Part No. P09_1539_106 (Pipe Outlet); and

- Part No. P09_1539_118 (Pipe Outlet).

91.   The CD390 Agreement provides, in pertinent part, as follows:

> *Subject to the General Terms and Conditions . . . (AIUS) has selected PXI AUTOMOTIVE MEXICO as the supplier for Ford CD390/539 Pipes.  The Purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier. . . .*
>
> *. . . .*
>
> *Agreed tooling costs will be reimbursed by AIUS, as follows: 50% with Order, 30% First Samples, 20% PPAP Approval.*

**(Exhibit 5)**

92.   Following execution of the CD390 Agreement, and in reliance on AIUS' promises and obligations set forth therein, PXI expended $11,084.00 in tooling costs as identified above so as to mobilize its production capabilities.

93.   The CD390 Agreement contained a chart identifying part numbers and initial pricing for three parts covered under the CD390 Agreement.  The CD390 Agreement contained another chart entitled "Ford CD390/539 AIMX Capacity Requirement Estimated Vehicle sets" which set forth an annual volume of 27,744 for each of the three part numbers.

94.   Despite the annual volumes set forth above, AIUS never ordered parts from PXI under the CD390 Agreement.  Instead, shortly after PXI incurred tooling and other costs, AIUS informed PXI that it was cancelling the CD390 Agreement without ever paying for any tooling

costs or ordering any parts.

95.     The CD390 Agreement is a valid, binding and enforceable requirements contract between PXI and AIUS.

96.     The CD390 Agreement is a "contract for the sale of goods" governed by Article 2 of the Michigan Uniform Commercial Code, MCL 440.2101 et seq.

97.     Under MCL 440.2306, a term which measures the quantity by the requirements of the buyer means such requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimated may be demanded.

98.     By ordering zero parts and then unilaterally cancelling the CD390 Agreement, the volume of parts actually ordered by AIUS was unreasonably disproportionate to AIUS' stated annual estimates.

99.     In light of the foregoing actions, AIUS willfully and materially breached the CD390 Agreement.

100.    As a direct and proximate result of AIUS's breach of the CD390 Agreement, PXI has suffered damages in excess of $11,000.

## <u>COUNT VIII</u>
### (Promissory Estoppel – Alternative to Counts VI and VII)

101.    Plaintiff pleads Count VIII as an alternative to Counts VI and VII above.

102.    Plaintiff incorporates paragraphs 1 through 100 above as and for paragraph 102 of this count.

103.    As part of the GE2 and CD390 Agreements, AIUS promised to purchase parts from PXI in or around the estimated volumes set forth in those agreements.

104.    PXI reasonably relied on AIUS's representations and promises that it would purchase parts from PXI under the GE2 and CD390 Agreement. As a result, PXI incurred tooling

costs in connection with launching production of parts under these agreements. Specifically, PXI expended $46,996 in connection with the GE2 project and $11,084 in connection with the CD390 project.

105.   AIUS's promises to purchase parts from PXI under the GE2 and CD390 Agreements was illusory. AIUS cancelled the GE2 and CD390 projects shortly after PXI expended its tooling costs to launch production under these agreements.

106.   PXI relied on AIUS's representations and promises that it would purchase products under the G2 and CD390 Agreements to its detriment and, as a result, has sustained damages in excess of $25,000 and reasonably believed to be in excess of $58,000.

107.   To avoid injustice, this Court should specifically compensate PXI for the damages it has incurred as a result of AIUS's actions.

WHEREFORE, Plaintiff, PXI AUTOMOTIVE MEXICO S de R.L. de CV, prays for judgment in its favor and against Defendant, AIR INTERNATIONAL (US), INC., for monetary damages in an amount to be determined at trial, but reasonably believed to be in excess of $1,000,000 plus interest, litigation costs and expenses, and such other and further relief as the Court deems just and proper.

KERR, RUSSELL AND WEBER, PLC

By:   /s/ M.A. Sneyd
       James E. DeLine (P45205)
       Michael Sneyd (P52073)
       Attorneys for Plaintiff
       500 Woodward Ave., Ste. 2500
       Detroit, MI 48226-3406

Dated:  December 11, 2025      (313) 961-0200
       jdeline@kerr-russell.com
       msneyd@kerr-russell.com

{80000/317/D2079695.DOCX;1}

**EXHIBIT 1**



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
|---|---|

**DEFINITIONS**

| OEM | Original Equipment Manufacturer (i.e. GM, Ford, VW, Chrysler) |
|---|---|
| Air | ***Air International Thermal Systems*** |
| Order | Written agreement for the goods and services |
| Components | Shall mean the individual parts, subassemblies and other durable goods as identified in Schedule E which are to be assembled into the Products, as well as packaging, lubricants, talc or other manufacturing aids or materials. |
| Customer | Shall mean any party which has contracted with Air International for supply of Products and which has been designated by Air for delivery of assembled Products. |
| Forecast | ***Calculate or predict (some future event or condition) usually as a result of study and analysis of available pertinent data*** |
| LCR/MCR | Lean Capacity Rate, Maximum Capacity Rate |
| Manufacturing Provider | Shall mean the company contracted by Air to Assemble Products |
| Products | shall mean the complete and assembled systems, assemblies and subassemblies as defined in Schedule A |
| Release Authorization | Electronic transmissions of planning requirements; these releases constitute Air's fabrication, raw material and forecast requirements per the terms of this Order |
| Delivery Schedule | Electronic transmissions of ship requirements |
| Service | Shall mean Products or Components required by the Customer to repair or replace Product which has been sold to the Customer |
| Standards | Shall mean (a) the written specifications, electronic files, requirements, drawings and standards as defined by Air, (b) the procedures, work instructions and forms, as developed and agreed to by Air and Supplier, (c) the quality control program applicable to Goods and Services as set forth in the Air "Supplier Quality Assurance Guide" and amendments thereto |
| Sub-supplier | Shall mean the parties who are contracted by the Manufacturing Provider and who supply Components for use in the Air Products |
| Supplier | Shall mean the parties who are contracted by Air and who supply Components to Air, by delivery to Air directly or by delivery to Abbreviated Name as set forth in this Agreement. |

1.  ACCEPTANCE
    Any expression of acceptance of this purchase order by Supplier, including Supplier's commencement of (i) work on the goods subject to the purchase order (the "Goods") or shipment of the Goods, whichever occurs first, or (ii) performance of all or any portion of the services subject to the purchase order (the "Services"), or (iii) upon written, telecopied or electronic data acceptance thereof by Supplier,  shall constitute an acceptance of Buyer's offer to purchase contained in the purchase order, upon Buyer becoming aware of such acceptance.  Any acceptance of the purchase order is limited to and conditional upon Supplier's acceptance of the express terms contained on the face of the purchase order, in the purchase order terms and conditions, and in any addendum, supplement, Supplier manual and/or other document attached to, forming part of, or incorporated by reference in, the purchase order, in each case as expressly stipulated by Buyer (collectively, "this Order").  In the event of any conflict between the face of the purchase order and these purchase order terms and conditions, the face of the purchase order shall govern.

    Any proposal for additional or different terms or any attempt by Supplier to vary any of the terms of this



| | PURCHASE ORDER |
| --- | --- |
| **Air International Thermal Systems** | **GENERAL TERMS AND CONDITIONS** |

Order, whether in Supplier's quotation form, acknowledgement form, invoice, correspondence or otherwise, shall be deemed material and hereby is object to and rejected by Buyer, but any such proposal or attempted variance shall not operate as a rejection of this Order is Supplier accepts Buyer's offer by commencement of work shipment of the Goods or performance of the Services, or by other means acceptable to Buyer, in which case this Order shall be deemed accepted by Supplier without any additional or different terms or variations whatsoever. This Order does not constitute an acceptance of any prior offer or proposal by Supplier, and any reference in this Order to any such prior offer of proposal is solely to incorporate the description or specifications of the Goods and the Services in such offer or proposal, but only to the extent that such description or specifications are not directly in conflict with the description and specifications in this Order. If this Order is found to be an acceptance of any prior offer or proposal by Supplier, such acceptance shall be limited to the express terms contained in this Order. Any additional or different terms in such prior offer or proposal shall be deemed material and are hereby objected to and rejected by Buyer. Buyer may cancel all or any part of this Order at any time prior to Buyer's actual knowledge of acceptance by Supplier.

Any modifications to this Order shall be made in accordance with the Paragraph "ENTIRE AGREEMENT."

2. **TERM**
Unless otherwise expressly provided in this Order or in any other written agreement between Buyer and Supplier, the term of this Order (the "Term") is for the period commencing on the date set forth on the Order and continuing through the end of the vehicle platform(s) for which such Goods are supplied, including any extensions thereof.

3. **OEM CUSTOMER REQUIREMENTS**
Where the Goods or Services under this Order are or will be sold, or incorporated into goods or services that are or will be sold, by Buyer to an original equipment manufacturer of vehicles, whether directly or indirectly through an upper tier supplier (such manufacturer or upper tier supplier, the "OEM Customer"), Supplier shall take such steps, provide such disclosure, comply with such requirements and do all other things as Buyer deems necessary or desirable and within Supplier's control to enable Buyer to meet Buyer's obligations under the terms and conditions of any purchase order or other document (the "OEM Terms") that may be applicable to Buyer from time to time in respect of its direct or indirect supply of such goods or services to the OEM Customer, including: delivery, packaging and labelling requirements; warranties and warranty periods; intellectual property rights and indemnification; confidentiality; access to facilities and records; and replacement and service parts. Buyer may, from time to time, in its sole discretion, provide Supplier with information regarding the applicable OEM Terms, but, in any event, Supplier shall be responsible for ascertaining the OEM Terms that may affect Supplier's obligations hereunder.

If there is any conflict between the provisions of the OEM Terms and any provisions in this Order, Buyer shall have the right to have the provisions of the OEM Terms prevail to the extent necessary or desirable to resolve such conflict.

4. **PERFORMANCE AND RIGHTS**
Without limiting its other obligations under this agreement, the Supplier must, at all times: (a) manufacture and supply the Products: (i) in a proper and efficient manner and in accordance with this agreement, all applicable Laws, standards and codes, including any standards, codes and procedures of Air details of which are provided in writing to the Supplier from time to time; and (ii) in accordance with the Specifications, drawing, samples or other descriptions from time to time required or directed by Air; (b) ensure that the Products comply with any Laws relating to: (i) the safety, packing, labelling,

 **Air International** Thermal Systems

| | PURCHASE ORDER |
|---|---|
| | **GENERAL TERMS AND CONDITIONS** |

transportation, delivery, importation, exportation and sale of the Products; and (ii) the nature, substance and quality of the Products; (c) comply with all quality requirements and procedures specified by Air from time to time; (d) ensure that it does not and that any third party does not use the Specifications, drawings or samples provided by Air for their own use; (e) hold and shall comply with all licences, permits and other approvals required for the manufacture, supply, storage, handling and transportation of the Products; (f) keep and maintain all plant and equipment necessary for the production of the products in good condition and in accordance with good industry practice; (g) ensure that the processes used in the manufacture and supply of the Products shall not infringe any Intellectual Property Rights of any other person and the Supplier waives any Claims it has against Air, in respect of the infringement of Intellectual Property Rights of any other person, arising out of the Supplier complying with the Specifications; (h) Pack, mark and transport the products in accordance with, the Specifications and any other requirements of Air; and (i) Neither the Supplier nor any permitted sub-contractors will utilise child, slave, prisoner or any other form of forced or involuntary labour in the supply of the Products. (b) The Supplier must ensure that it possesses sufficient facilities and resources and suitably qualified, skilled and experienced personnel to enable it to perform its obligations under this agreement.

The Supplier will ensure that the Products remain competitive in terms of technology, design, price and quality with similar goods available to Air.

5. **PRICE WARRANTY**
Supplier warrants that the prices for the goods or services sold to Buyer hereunder are no less favourable than Supplier currently extends to any other customer for the same or similar goods or services in similar quantities. If Supplier reduces its prices to others for the same or similar goods or services during the term of this Order, Supplier will reduce the prices to Buyer for such goods or services correspondingly. Supplier warrants that the prices shown on this Order are complete and that no additional charges of any type will be added without Buyer's express written consent. If Supplier sells the part covered by the Order to a third party for incorporation into an assembly which is to be sold to Buyer, the price for such parts will be no more than the price provided in this order.

6. **PRICE FOR PRODUCTS**
Air must pay the Supplier the goods or services as shown on the face of the Order in accordance with the payment terms of the order. The Supplier will use its best efforts to implement cost savings and productivity improvements in order to reduce the price payable. Contracted price reductions, expressed in percentage terms, and their effective dates are shown on the face of the Order. In all cases, the percentage shall be applied to the then current purchased price.

7. **INVOICES**
Air reserves the right to issue site specific requirements for invoicing. In general, Supplier invoices must be issued to Air within three business days of dispatching the products to Air, and must include the following information: (i) Supplier name and address (ii) Date of invoice (iii) Air purchase order number (iv) Description of goods or services, and any relevant part number (v) BOL and/or RAN (Release Authorization Number) where applicable (vi) Quantity of goods delivered, and unit price (vii) Total price, including any GST (viii) (ix) Air will not pay any invoice submitted to Air after 120 days from receipt of goods or services. Prototype shipments require all of the above mentioned items. In addition, a copy of the actual Bill of Lading document must be sent to Air's Finance Department within three business days of Prototype Shipments.



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
|---|---|

8.  **LABELLING, PACKING AND SHIPPING**
The Goods are to be suitably prepared for shipment and must be labelled, packed and shipped in accordance with Buyer's specifications, the requirements of the involved carriers, and, if applicable, the country of destination, as specified in this Order and/or in any written directions and/or instructions as may be provided by Buyer to Supplier from time to time. If the Goods are not labelled, packed and shipped in accordance with Buyer's specifications, Supplier shall pay or reimburse Buyer for any excess costs occasioned thereby. Unless otherwise expressly stated in this Order, Supplier shall not charge Buyer for labelling, packing, boxing or crating, handling, storage, or transportation of goods.

Buyer may specify the carrier and/or method of transportation and Supplier will process shipping documents and route shipments of the goods from the shipping point accordingly. Supplier will comply with all of Buyer's transportation routing instructions, including, but not limited to, mode of transportation, utilization of assigned carrier and identification of the shipping point. Supplier will be responsible for all excess costs incurred because of its failure to comply with Buyer's transportation instructions. (c) Buyer will not be responsible for delays in the payment of invoices if Buyer's invoicing requirements are not met.

Supplier further agrees: (a) to accept payment based upon Buyer's receipt procedure and to accept payment by electronic transfer of funds or, at Buyer's discretion, payment by check. Buyer reserves the right to require an invoice. The payment date is set forth in the Buyer's orders. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this order.

9.  **DELIVERY SCHEDULES**
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules. Buyer shall not be required to make payment for goods delivered to Buyer which are in excess of quantities specified in Buyer's delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Supplier to a modification of the price for goods or services covered by this order. Where quantities and/or delivery schedules are not specified, Supplier shall deliver goods in such quantities and times as Buyer may direct in subsequent releases. The Supplier must not vary the delivery quantity or the date specified or the location in Buyer's schedules without first obtaining the written consent of Air.

10. **PREMIUM SHIPMENTS**
If Supplier's acts or omissions results in Supplier's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Supplier shall ship the goods as expeditiously as possible at Supplier's sole expense.

11. **RELEASE AUTHORIZATIONS**
When Air issues written or electronic releases, Supplier will not fabricate or assemble any goods, nor procure required materials, nor ship any supplies, except to the extent authorized by such written or electronic releases or provisions of this Order specifying minimum fabrication or delivery quantities. In the event of any conflict between the face of this Order and the Release Authorization, the face of the Order shall govern.

12. **ELECTRONIC DATA INTERFACE**
Where applicable, each Supplier and Manufacturing Provider is required to send EDI transmissions of Advanced Shipping Notices (ASN), releases, forecasts, inventory levels and receipt of consigned material. Please refer to Air's Supplier Quality Manual for a detail listing of EDI requirements.



| | |
|---|---|
| **Air International** Thermal Systems | **PURCHASE ORDER**<br>**GENERAL TERMS AND CONDITIONS** |

13. **EXCLUSIVITY**

if the goods subject to this Order were developed by Air, or manufacture, in whole or in part, with Air property, or if Air paid some or all of the development costs for the goods, then Supplier acknowledges · and agrees that it shall sell and deliver the goods exclusively to Air, or to its authorized designee, and to no other person or entity. Any such designee authorization is required to evidenced by a writing signed by Air.

14. **ASSISTANCE AND INFORMATION**

The Supplier must provide Air with all information reasonably requested by Air in relation to the manufacture, storage, testing, handling and delivery or the Products including information regarding the content and amount of ingredients making up the Product.

15. **HAZARDOUS MATERIALS**

For goods that may contain potentially hazardous materials, if requested by Buyer, Supplier shall promptly furnish to Buyer in whatever form and detail Buyer requests a Material Safety Data Sheet (MSDS) with (i) a list of all potentially hazardous ingredients in the goods (ii) the quantity of one or more such ingredients and (iii) information concerning any changes in or additions to such ingredients. Before shipping the goods, Supplier agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions necessary to advise carriers, Buyer, and their respective employees how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer. Supplier shall comply with all applicable federal, state, provincial and local laws and regulations pertaining to product and warning labels. (e) Supplier shall comply with Buyer's applicable environmental requirements.

16. **CHANGES**

Buyer reserves the right at any time to direct changes, or cause Supplier to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this order including work with respect to such matters as inspection, testing or quality control, and Supplier agrees to promptly make such changes. Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this Agreement shall be made in accordance with the Paragraph ENTIRE AGREEMENT.

All engineering changes (including process, machine, material and machine method) whether initiated by Air or Supplier, will be processed pursuant to the Air change notice procedure (by one or more engineering change instructions, requests for design and development of parts, inspection standards, drawings, computer aided design data, or other similar documentation, and all required changes shall be made in strict conformity with such forms) then in effect, which procedure shall include prior written approval by Air. All Air approved engineering changes to the part specification will be implemented by Supplier as directed by Air. Price changes for Air approved engineering changes are to be based solely on the product cost variance from the superseded design and must be substantiated with appropriate documentation satisfactory to Air.

Supplier certifies the location(s) from which it will ship the goods covered by the Order are as specified in the Order. If Supplier at any time wishes to change such location(s), Supplier must provide a written notice to Air and receive written Air approval prior to such change so that the effect of such change can be evaluated, and negotiated as necessary, for its effect on transportation costs, transit time, packaging methods, and other significant impact on Air. If Supplier does not notify Air of any increased



| | |
|---|---|
| **Air International** Thermal Systems | **PURCHASE ORDER GENERAL TERMS AND CONDITIONS** |

transportation charges in advance of a change in shipping point(s), Supplier will be responsible for such costs.

17. SUPPLIER QUALITY AND DEVELOPMENT, INSPECTION

Supplier agrees to participate in Buyer's Supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Supplier as set forth in the AIAG Quality System Requirements TS-16949 and Air International's Quality Assurance Guide. In addition Buyer shall have the right to enter Supplier's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this order. Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

The Supplier must comply will Air's requirements in relation to the following: (i) APQP (ii) electronic communication of quality management-related data (iii) the quality development program which Air tailors to the supplier to help optimize development of the supplier's quality of supply.

18. INSPECTION AND REJECTIONS

Air and/or, for all purposes of this entire Section INSPECTION AND REJECTIONS, its authorized and designated representatives, affiliates, and assigns, may inspect and evaluate all goods (including all tooling and material used in their manufacture) and all services and times and places designated by Air. Inspections by Air shall not supplant Supplier's warranty or other obligations hereunder. Supplier shall develop an inspection agreement including inspection standard with Air's approval on agreement scope and conditions. Supplier will perform inspections as designated by Air and supplier will make inspection systems, procedure and records available to Air upon request.

Supplier acknowledges that Buyer is not responsible for performing incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this order will automatically be reduced unless Buyer otherwise notifies Supplier. Supplier will not replace quantities so reduced without a new order or schedule from Buyer.

Notwithstanding payment or any prior inspection, Air may revoke acceptance, reject, or require correction and return to the Supplier (at Supplier's expense and risk of loss) any goods delivered or services rendered that do not conform to applicable requirements. This Order is issued for the part specifically identified in the Order and any substitution of material, without prior Air approval, will be considered a breach of this Order. In such event, and without limiting its remedies, after notice to Supplier, Air cancel the Order for default under Section TERMINATION FOR BREACH OR NONPERFORMANCE hereof, and/or cause the removal of Supplier as an Air supplier. (b) If any goods or shipment of goods are rejected as nonconforming by AIR, Supplier shall, at its cost and as directed by Air, either (i) repair such goods, which work shall include, but shall not be limited to, performing such additional work (including the cost of any materials) as is necessary to make such goods fully conforming, or (ii) replace the goods with replacement goods, such replacement goods to be delivered to AIR in accordance with any and all instructions provided by AIR. (c) If AIR determines in its sole discretion that rework is necessary for the repair of any goods, then AIR may elect to either perform the rework itself or to have a third party perform the rework. In either case, the cost of such rework shall be (i) offset against the amounts otherwise due Supplier for such rejected goods, or (ii) charged separately to Supplier. Further, AIR may require that the rework be performed on AIR's premises by Supplier, in which case AIR shall provide Supplier with reasonable access to its premises and otherwise assist Supplier with such arrangements as are necessary to perform the rework. In performing rework or replacing rejected goods, Supplier is responsible for segregating and sorting any applicable goods, providing for transportation of the goods



**PURCHASE ORDER**
**GENERAL TERMS AND CONDITIONS**

and supervising the segregation and removal of the goods, all at its cost. (d) Supplier may use temporary employees and/or a third party to perform rework only with AIR's prior written consent. At all times, such temporary employees and/or third parties shall be employees and/or independent contractors of Supplier, and not employees or independent contractors of AIR. Temporary employees and third parties must comply with all of the AIR's practices, policies, and procedures then in effect when on AIR's facilities to perform rework, and AIR may exercise such supervisory control as is necessary to ensure compliance with such practices, policies and procedures. Unless AIR exercises its right to supervision, it is Supplier's responsibility to supervise temporary employees and third parties performing rework on AIR's premises. (e) With respect to any rejected goods to be repaired, AIR will not be deemed to have accepted such goods unless and until the rejected goods are fully repaired to the requirements of this Order and are independently accepted by AIR following such rework. (f) Rejected goods, if not required to be repaired as provided by this Section 8, shall be removed by Supplier at its cost from AIR's premises immediately after being notified, and, if not so removed by Supplier, such rejected goods may be disposed of by AIR at Supplier's expense. (g) It is the intention of AIR to attempt to utilize repair or replacement as its principal remedies in the case of rejected goods, but such intention shall not be deemed a limitation of its remedies. If AIR requires and accepts replacement or reworked goods, such actions shall not be an election of remedies, nor shall it in any way limit the rights and remedies of AIR under this Order for the breach by Supplier caused by its tender of rejected goods.

19. FORCE MAJEURE
Any delay or failure of either party to perform it's obligations hereunder shall be excused, if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, such as, by way of example and not by way of limitation, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes, and slowdowns), inability to obtain power, material, labor, equipment or transportation, or court injunction or order, provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Supplier, Buyer, at it's option, may purchase goods from other sources and reduce it's schedules to Supplier by such quantities, without liability to Supplier, or have Supplier provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this order.

20. LABOR DISPUTES
Supplier will notify Air immediately of any actual or potential labor dispute delaying or threatening to delay timely performance of this Order, and will provide all relevant information to Air. Supplier will notify Air in writing six (6) months in advance of the expiration of any current labor contract affecting Supplier. Prior to the expiration of any labor contract of Supplier, Supplier will establish, at its expense, a forty (40) working day supply of goods in a neutral warehouse site to be located in the country of manufacture at least fifty (50) miles from Supplier's manufacturing locations. Such supply of goods will be in place at least fifteen (15) working days prior to the expiration of any such labor contract. If requested by Buyer, Supplier shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Supplier does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this order with out liability.

21. WARRANTY
a) Supplier expressly warrants to AIR that all goods and services will be manufactured, provided, transported and delivered to AIR in full and complete conformity and compliance with all Order requirements, specifications, drawings, and samples or other descriptions furnished or specified by AIR, all Quality Standards, and all applicable manufacturing and legal requirements under applicable law.



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
|---|---|

Further, Supplier expressly warrants that all goods and services will be merchantable, of good material and workmanship and free from defects. If AIR does not provide the design for goods, Supplier expressly warrants that the design of the goods shall be free from defects. Supplier expressly warrants that all goods will be fit and sufficient for the purposes intended by AIR. The warranty term will be coterminous with the warranty extended by AIR (which, for all purposes of this entire Section 12, shall include its authorized and designated representatives, distributors, affiliates, and assigns (e.g. Manufacturing Providers) to its customers. Supplier's liability for a breach of the warranties given herein will be determined by AIR's analysis of a sample of parts against which claims are made that the parts are defective. Supplier will participate in such analysis in accordance with AIR procedures. Supplier shall accept AIR's claim data. (b) Supplier shall pay the full cost and expense of any warranty claim resulting from a defective or deficient part of any goods or services. AIR claims for reimbursement and corresponding payments by Supplier shall be processed in accordance with AIR procedures. (c) Supplier further warrants that on delivery AIR will receive good title to the goods and services, free and clear of all liens and encumbrances and that all goods and services will be free from any actual or claimed patent, copyright or trademark infringement. (d) Supplier also warrants that no part of any goods or services provided under the Order shall contain any traces of silicone (any of a large class of polymers of R2SiO where R is a hydrocarbon). (e) These warranties are in addition to any warranties implied by law or otherwise made by Supplier and will survive acceptance and payment by AIR.

22. RECALL CAMPAIGN
In the event Air and/or its affiliates or customers determine that a recall campaign is necessary to remedy a breach of Supplier's warranty to comply with law, regulations, orders, or other government requirements, the full cost and expense of such recall shall be borne by Supplier, unless supplier proves that there was no defect or deficiency in the goods. The supplier will hold recall insurance sufficient to meet any warranty claim costs, with a claim excess no greater than 10% of the annual revenues of the supplier entity, for each new fault. The supplier's recall insurance policy will contain a clause that Air be provided with details, directly from the insurer, of the amount of coverage, the claim excess, and any subsequent amendment to the policy.

23. INGREDIENTS DISCLOSURE, SPECIAL WARNINGS AND INSTRUCTIONS
If requested by Buyer, Supplier shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods (b) the amount of all ingredients and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Supplier agrees to furnish Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

24. INSOLVENCY
AIR may immediately terminate this Order without liability to Supplier in any of the following or any other comparable events: (a) insolvency of Supplier; (b) filing of a voluntary petition in bankruptcy by Supplier; (c) filing of any involuntary petition in bankruptcy against Supplier; (d) appointment of a receiver or trustee for Supplier; (e) execution of an assignment for the benefit of creditors by Supplier, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event, or (f) Supplier's failure or inability, within 10 days of AIR's written request, to provide reasonable assurance of financial stability or due performance. Supplier shall reimburse AIR for all costs incurred by AIR in connection with any of the foregoing, including, but not limited to, all attorneys' or other professional fees.



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
| --- | --- |

**25. TERMINATION FOR BREACH, NON-PERFORMANCE, SALE OF ASSETS, OR CHANGE IN CONTROL.**

(a) Supplier acknowledges that, in entering into the Order, AIR shall become entirely dependent upon Supplier for the timely development and production of samples and prototypes of the goods, for the supply of the goods, and, as a result, for the production by AIR of its vehicles in accordance with the schedules contemplated in this Order. Supplier further recognizes that failure to timely and fully perform its obligations hereunder may affect the viability of the manufacturing of the vehicles, and that AIR shall suffer substantial losses and damages which cannot be measured solely in monetary terms. Supplier, therefore, expressly agrees that AIR shall have the right to compel specific performance of the Order by Supplier, or alternatively, to terminate the Order upon written notice to Supplier if Supplier (i) fails to deliver conforming goods, or perform services, at the times specified herein; (ii) fails to perform any other provision hereof and fails to cure such failure within a period of (10) days after receipt of written notice from AIR specifying such failure; (iii) ceases doing business as a going concern or admits in writing its inability to perform its obligations under the Order as and when due; (iv) is merged into another company and/or is expropriated or nationalized. In any such event, AIR may cancel the whole or any part of the Order without any liability, except for payment due for goods or services delivered and accepted. Upon such termination, AIR shall have the right, on notice to Supplier, to take title to and possession of all or any part of such work performed by Supplier or paid for by AIR under this Order. In addition, in any such event AIR shall be entitled to recover from Supplier all losses, expenses, and damages of every kind and nature, including, but not limited to, attorney's fees, court costs, incidental and consequential damages, and lost profits, which AIR may suffer as a result of such default by Supplier. (b) In the event Supplier fails to provide AIR with goods as defined herein that meet the quality and performance standards set forth by AIR or otherwise, AIR may terminate this Order or seek any additional reasonable remedies for Supplier's continued failure to meet quality standards as expressed to Supplier. (c) If the Order is terminated by AIR hereunder, or, without termination, if AIR reasonably believes Supplier will be unable to supply quantities of the goods within the times and in compliance with the specifications contained in the Order, AIR may exercise all rights and remedies available under applicable law and under this Order to ensure the timely production and delivery of its products, specifically including, without limitation, the right to take immediate possession of all AIR Property and to remove the same from Supplier's premises or wherever the AIR Property may be located. Supplier shall cooperate with and assist AIR in connection with its exercise of the foregoing rights and shall in no event seek to oppose or interfere with the exercise by AIR of such rights. Upon AIR's demand, with or without termination of this Order, Supplier shall assemble AIR's Property and put AIR in sole and exclusive possession of AIR's Property. Supplier grants to AIR a license over and upon all lands, real estate, buildings, and properties of Supplier, wherever situated, for the purposes of ingress, egress, loading, transporting, removing, and selling AIR's Property, and said license shall inure to the benefit of AIR, its agents, employees, representatives, and contractors. If Supplier fails to assemble and deliver AIR's Property to AIR upon demand, AIR shall be entitled to recover from Supplier all losses, expenses, and damages of every kind and nature, including attorney's fees and costs and incidental and consequential damages which AIR may suffer as a result of such default or failure by Supplier. In this regard, AIR's cost incurred in breaking down, packing, moving, and reassembling the AIR Property in order that the AIR Property may be used by AIR or its assignees shall constitute recoverable damages. (d) In order to enable AIR to continue with the manufacture of the goods in the event AIR takes possession of the AIR Property pursuant to any Section of the Order, Supplier shall include in its contracts and orders with its sub-suppliers that such contracts and orders can be assigned to AIR. Furthermore, Supplier shall include in its contracts and orders with sub-suppliers the rights of AIR set forth in subsection (c) with respect to any AIR Property and any of the sub-supplier's special tooling and equipment required to assure the continued manufacture and delivery of AIR's products, and assign such special tooling and equipment to AIR as a third party beneficiary. (e) AIR may at any time and without notice deduct or set-off Supplier's claims for money due or to become due from AIR against any claims that AIR has or may have arising out of this or any other transaction between AIR



| | PURCHASE ORDER |
| Air International Thermal Systems | GENERAL TERMS AND CONDITIONS |

and Supplier.   (f) To the extent provisions of the Order are intended to survive any expiration or termination of the Order, these provisions shall remain in effect accordingly.

26.  TERMINATION FOR CONVENIENCE
Notwithstanding any other provision of this Order, AIR may terminate all or any part of this Order at any time without cause, in whole or in part, by written notice, whereupon Supplier shall stop work on the date and to the extent specified in such notice, and terminate all orders and subcontracts that relate to the terminated Order.  In such case, AIR shall (i) have no liability with respect to goods or services procured, or worked on, or supplies partially fabricated, in excess of the authority contained in this Section 29, and (ii) have the right to immediately recover the AIR Property in accordance with the provisions of Section 25(c) above.  Upon termination pursuant to this Section 26, Supplier shall submit all claims resulting from such termination within thirty (30) days after receipt of the termination notice.  AIR shall have the right to verify such claims by auditing the relevant records, facilities, work, or materials of Supplier and/or its subcontractors.  AIR shall pay Supplier for finished work accepted by AIR, as well as for the documented cost to Supplier of work in process and raw materials allocable to the terminated work which are not in excess of any prior AIR authorization.  Payment made under this Section 26 shall constitute the only liability of AIR for termination under the Order, with title and right of possession to all delivered goods and services vesting in AIR immediately upon tender of payment by AIR.  The provisions of this Section TERMINATION FOR CONVENIENCE shall not apply to any termination by AIR for default or breach by Supplier as set forth in the Section TERMINATION FOR BREACH, NON-PERFORMANCE, SALE OF ASSETS, OR CHANGE IN CONTROL.  In no event shall AIR be liable for prospective or anticipated profits by reason of such termination, and Supplier shall not assert any claim for loss of prospective or anticipatory profits or consequential damages under any circumstances.

27.  INTELLECTUAL PROPERTY
Supplier agrees: (a) to defend, hold harmless and indemnify AIR, its directors, officers, employees, authorized distributors, dealers, successors and assigns, against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) to the extent arising in any way  from Supplier's acts or omissions regarding the goods or services contracted, including such claims where Supplier has provided only part of the goods or services; Supplier expressly waives any claim against AIR that such infringement arose out of compliance with AIR's specification; (b) that AIR or AIR's subcontractor have the right to repair, reconstruct, or rebuild the specific goods delivered under this Order without payment of any royalty to Supplier; (c) that parts manufactured based on AIR's drawings and/or specifications may not be used for its own use or sold to third parties without AIR's express written authorization; and (d) to the extent that this Order is issued for the creation of copyrightable works, the works shall be considered "works made for hire;" to the extent that the works do not qualify as "works made for hire," Supplier hereby assigns to AIR all right, title and interest in all copyrights and moral rights therein.  With respect to any inventions, patents or processes which Supplier conceives or first reduces to practice in the course of Supplier's activities under this Order, Supplier hereby grants to AIR a permanent, paid-up, non-exclusive, worldwide license, with a right to sublicense to others, to make and/or use, any composites, tools, machines, processes, products, or services that are encompassed within, or covered by, such inventions, patents or processes.  No rights are granted to Supplier under any AIR patents except as may be necessary to fulfill Supplier's obligations under this Order.

28.  TECHNICAL INFORMATION DISCLOSED TO SELLER
The specifications, drawings, designs, manufacturing data and other information transmitted to Supplier by AIR in connection with the performance of this Order (the "Information") are the confidential property of AIR and may be covered by one or more AIR patents, patent applications or copyrights.  Supplier will



| | PURCHASE ORDER<br>GENERAL TERMS AND CONDITIONS |
|---|---|

handle all of this information in such a manner to ensure that it is not used for any purpose detrimental to the interests of AIR. Supplier shall not disclose any such Information to any person or entity without obtaining the prior express written consent of AIR.

29. TECHNICAL INFORMATION DISCLOSED TO BUYER
Supplier agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Supplier shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this order.

30. INDEMNIFICATION
(a) To the full extent permitted by applicable law, Supplier will indemnify, defend and hold harmless AIR, its directors, officers, employees, authorized distributors, dealers, successors and assigns, for all claims, liabilities, damages, costs and expenses (including attorney fees, settlements, judgments, consequential damages and lost profits) incurred by AIR in connection with all actual or alleged claims (including lawsuits, administrative claims, regulatory actions, and other proceedings to recover for personal injury or death, property damage, or economic losses) that are related in any way to Supplier's representations, performance or obligations under this Order, including claims based on Supplier's breach of warranty and claims for any related violations of any applicable law, ordinance or regulation or government authorization or order. Supplier's obligation to indemnify AIR under this Section will apply regardless of whether the claim arises in tort, negligence, contract, warranty, product liability, strict liability or otherwise, except to the extent of the negligence or wilful misconduct of AIR. (b) If Supplier provides services to AIR on AIR's premises, Supplier will examine the premises to determine whether they are safe for such services and will advise AIR promptly of any situation it deems to be unsafe. Supplier's employees, contractors and agents will not possess, use, sell or transfer illegal drugs, medically unauthorized drugs or controlled substances, or unauthorized alcohol, and will not be under the influence of alcohol or drugs on AIR's premises. Supplier shall be exclusively responsible for, shall bear, and shall relieve AIR from liability for all loss, expense, damage or claims resulting from bodily injury, sickness or disease, including death at any time resulting there from, sustained by any person or persons, or on account of damage to or destruction of property, including that of AIR, arising out of, or in connection with the performance of work on AIR's premises except that Supplier shall not be responsible for or relieve AIR from liability for claims arising from the wilful misconduct or the sole negligence of AIR. (c) The provisions of this Section INDEMNIFCATION shall survive the expiration or termination of this Order.

31. INSURANCE
Supplier shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the terms on the face of this order. Supplier shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Supplier's furnishing of certificates of insurance or purchase of insurance shall not release Supplier of its obligations or liabilities under this order.

All insurance policies in any way related to the Order and secured and maintained by Supplier will waive all rights of recovery, under subrogation or otherwise, against AIR, its agents, representatives, affiliates, and all tiers of consultants or suppliers engaged by AIR. Supplier will require its subcontractors and suppliers to whatever tier, by appropriate written agreements, to give similar waivers each in favor of all parties enumerated in this section. Supplier shall furnish to AIR either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of AIR's written request. The certificate will provide that AIR will receive 30 days' prior written notice from the



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
|---|---|

insurer of any termination, non-renewal, or reduction in the amount or scope of coverage. AIR may require Supplier to furnish evidence of the foregoing insurance but failure to comply with these insurance requirements will not relieve Supplier of its liability and obligation under this section.

32. **SUPPLIER'S PROPERTY**

Unless otherwise agreed to by Buyer, Supplier, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ("Supplier's Property") necessary for the production of the goods. The cost of changes to Supplier's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Supplier shall insure Supplier's Property with full fire and extended coverage insurance for its replacement value. Supplier grants Buyer an irrevocable option to take possession of and title to Supplier's Property that is special for the production of the goods upon payment to Supplier of its net book value less any amounts that Buyer has previously paid to Supplier for the cost of such items, provided, however, that this option shall not apply if Supplier's Property is used to produce goods that are the standard stock of Supplier of if a substantial quantity of like goods are being sold by Supplier to others.

33. **BUYER'S PROPERTY TITLE AND IDENTIFICATION**

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Supplier to perform this order, or for which Supplier has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Supplier on a bailment basis ("Buyer's Property"). Supplier shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Supplier, at its expense, shall not be used by Supplier for any purpose other than the performance of this order, shall be deemed to be personalty, shall be conspicuously marked by Supplier as the property of Buyer in accordance with AIR procedures, shall not be commingled with the property of Supplier or with that of a third person, and shall not be moved from Supplier's premises without Buyer's prior written approval. AIR shall have the right to enter Supplier's and/or sub-supplier's premises at all times to inspect, retrieve, or recover such property and Supplier's records with respect thereto. Upon the request of AIR, AIR's Property shall be immediately released to AIR or delivered to AIR by Supplier, properly packed and marked in accordance with the requirements of the carrier selected by AIR to transport such property to any location designated by AIR. AIR shall pay to Supplier the reasonable costs of delivering such property to such location. When permitted by law, Supplier waives any lien or other rights that Supplier might otherwise have on any of AIR's Property for work performed on such property or otherwise.

34. **SERVICE AND REPLACEMENT PARTS**

Supplier will sell to Buyer goods necessary for it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this order. If the goods are systems or modules, Supplier will sell the components or parts that comprise the system or module at price(s) that shall not, in the aggregate, exceed the price of the system or module less assembly costs. During the 15-year period after Buyer completes current model purchases, Supplier will sell goods to Buyer to fulfill Buyer's past model service and replacement parts requirements. Unless otherwise agreed to by Buyer, the price(s) during the first 5 years of this period shall be those in effect at the conclusion of current model purchases. Thereafter, the part price for AIR's service requirements will be no greater than the last price stated in the Order plus or minus (i) any changes in the cost of materials since model build, plus (ii) a volume adjustment reflecting the actual increase in the cost per unit of producing fewer units, plus (iii) a set-up charge reflecting the actual cost of preparation for the production run, plus (iv) any additional costs actually incurred for special packaging. All of the foregoing components of the price will be documented to AIR's reasonable satisfaction, including, but not limited to, set-up detail, machine productivity, scrap allowance, labor inefficiencies and excess raw material requirements. (c) If the parts are manufactured in a country other

 **Air International**
Thermal Systems

# PURCHASE ORDER
# GENERAL TERMS AND CONDITIONS

than the country in which the goods are delivered to AIR, Supplier will mark the goods shipped for AIR's service requirements "Made in (country of origin)." (d) When requested by AIR, Supplier shall make service literature and other materials available at no additional charge to support AIR's service part sales activities.

35. RESOLUTION OF DISPUTES
(a) A party must not start arbitration or court proceedings (except proceedings seeking interlocutory or injunctive relief) in respect of a dispute arising out of this agreement (Dispute) unless it has complied with this clause. (b) If in relation to a Dispute a Disputant materially refuses to comply with any provision of the following clauses in RESOLUTION OF DISPUTES the other Disputant need not comply with the following clauses in relation to that Dispute.
Notification of Dispute
A party claiming that a Dispute has arisen must notify the other party to the Dispute giving details of the Dispute.
Discussions between the parties
(a) Within twenty Business Days after a party giving notice of a under Section RESOLUTION OF DISPUTES (or longer period agreed in writing by the parties to the Dispute) (Initial Period) each party to the dispute (Disputant) must meet and use all reasonable endeavours to resolve the Dispute.
Mediation
(a) If the Disputants are unable to resolve the Dispute within the Initial Period, each Disputant agrees that the Dispute must be referred to mediation, at the written request of either Disputant, to: (i) a mediator agreed on by the Disputants; or (ii) if the Disputants are unable to agree on a mediator within seven days after the end of the Initial Period, a mediator nominated by the then current AIR Chief Executive or the Chief Executive's nominee. (b) The role of any mediator is to assist in negotiating a resolution of the Dispute.  A mediator may not make a decision that is binding on a Disputant unless that Disputant has so agreed in writing. (c) Any information or documents disclosed by a Disputant under this clause: (i) must be kept confidential; and (ii) may not be used except to attempt to resolve the Dispute. (d) Each Disputant must bear its own costs of complying with this clause and the Disputants must bear equally the costs of any mediator engaged.

36. REMEDIES
The rights and remedies reserved to Buyer in this order shall be cumulative with, and additional to, all other or further remedies provided in law or equity.  Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 21, Buyer shall notify Supplier and Supplier shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods (b) resulting from production interruptions (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods.  If requested by Buyer, Supplier will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

37. CUSTOMS EXPORT CONTROLS
(a) Supplier will promptly notify AIR in writing of material or components used by Supplier in filling this Order, which Supplier purchases in a country other than the country in which the goods are delivered to AIR.  Supplier will furnish AIR with any documentation and information necessary to establish the country of origin or to comply with the applicable country's rules of origin requirements.  Supplier will promptly advise AIR of any material or components imported into the country of origin and any duty included in the purchase price of the goods.  (b) The rights to and benefits of any duty drawback, including rights developed by substitution and rights which may be acquired from Supplier's suppliers and export credits,



| | PURCHASE ORDER GENERAL TERMS AND CONDITIONS |
|---|---|

to the extent transferable to AIR, are the property of AIR. Supplier will provide all documentation and information and take any necessary steps to drawback any duty, taxes or fees paid to, and to receive export credits from, the government of the country of origin upon exportation of the goods from such country. (c) The responsibility for customs duty and customs brokers' fees will be determined in accordance with the transportation code stated in this Order. If AIR is responsible for customs duties, it will be responsible for normal duties only. Supplier will be responsible for any special duties, including but not limited to, marking, anti-dumping and countervailing duties, to the extent permitted under the law of the country of importation. Supplier will provide AIR or the appropriate governmental authority all documentation and information required by law or regulation or otherwise necessary to determine the proper minimum duty to be paid upon the importation of the goods into any country or to obtain any refunds or drawbacks of duties paid. (d) Supplier will advise AIR if the importation or exportation of the goods requires an import or export license. Supplier will assist AIR in obtaining any such license. (e) Supplier will provide to AIR and the appropriate governmental agency the documentation necessary to determine the admissibility and the effect of entry of the goods into the country in which the goods are delivered to AIR. Supplier warrants that the information regarding the import or export of the goods supplied to AIR is true and correct in every respect and that all sales covered by this Order will be made at not less than fair value under the anti-dumping laws of the countries to which the goods are exported.

38. TAXES.
The goods purchased hereunder are for resale or for an exempt purpose and are exempt from state and local sales or use taxes. In the event that any local, state, federal, or other applicable fees, assessments and taxes are levied or based upon the sale of goods or services to AIR hereunder, and are not abated or exempt from payment, Seller shall timely pay all such fees, assessments and taxes, and shall provide evidence of such payment to AIR upon request.

39. SETOFF/RECOUPMENT
In addition to any right of setoff or recoupment provided by law, all amounts due to Supplier shall be considered net of indebtedness of Supplier and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries and Buyer shall have the right to setoff against or to recoup from any amounts due to Supplier and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

40. USE OF AIR INTERNATIONAL'S NAME
Supplier will not, without the prior written consent of AIR, in any manner publish the fact that Supplier has furnished or contracted to furnish AIR goods and/or services, or use the name or trademarks of AIR, their products, or any of their associated companies in Supplier's advertising or other publications. Supplier will not place its, or any third party's trademark or other designation on the part if the part bears an AIR trademark or an identifying mark specified by AIR, or if the part is specific or proprietary to AIR's design ("Marked Parts"). Supplier will sell Marked Parts, and similar goods, only to AIR and will not sell Marked Parts or similar goods to third parties without AIR's prior written consent.

41. COMPLIANCE WITH LAWS, FORCED LABOR
Supplier, and any goods or services supplied by Supplier, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or which relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including but not limited to those relating to environmental matters, data protection and privacy, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Supplier further represents that neither it nor any of its subcontractors will utilize child, slave, prisoner or any other form of forced or involuntary labor or engage in abusive employment or corrupt business practices, in the supply of goods or provision of services under this order. At Buyer's request Supplier shall certify in writing its compliance



**PURCHASE ORDER**
**GENERAL TERMS AND CONDITIONS**

with the foregoing.  Supplier shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Supplier's noncompliance.

42. NO IMPLIED WAIVER
The failure of either party at any time to require performance by the other party of any provision of this order shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this order constitute a waiver or any succeeding breach of the same or any other provision.

43. NON-ASSIGNMENT
This Order will not be assigned or delegated by Supplier, in whole or in part, without AIR's prior written consent, including, but not limited to, the subcontracting of work to be performed hereunder or the transfer of AIR Property to third parties for the performance of work hereunder.  In the event that Supplier is permitted to subcontract or transfer any obligation of this Order, Supplier shall be as fully responsible to AIR for the acts and omissions of its subcontractors/transferees as it is for the acts and omissions of persons directly employed by Supplier.

44. RELATIONSHIP OF PARTIES
Supplier and Buyer are independent contracting parties and nothing in this order shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf or in the name of the other.

45. GOVERNING LAW; JURISDICTION
This order is to be construed according to the laws of the country (and state/province, if applicable) from which this order is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.   Any action or proceedings by Buyer against Supplier may be brought by Buyer in any court(s) having jurisdiction over Supplier or, at Buyer's option, in the court(s) having jurisdiction over Buyer's locations, in which event Supplier consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Supplier against Buyer may be brought by Supplier only in the court(s) having jurisdiction over the location of Buyer from which this order is issued.

46. SEVERABILITY
If any term(s) of this order is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of the order shall remain in full force and effect.

47. LANGUAGE – ENGLISH
All communications with Manufacturing, Engineering, Sales or Receiving/User location must be in English unless otherwise directed.  Examples of documents which must be submitted in English include, but are not limited to, APQP and PPAP Documentation, Supplier Warrants, Shipping Labels, Capability Studies and Data.

48. TRANSLATION
If these terms are translated into Chinese by AIR and issued as part of a contract, then if the Seller's legal address is within the P.R.C., the Chinese version shall prevail; otherwise, the English version shall



| | **PURCHASE ORDER** |
|---|---|
| | **GENERAL TERMS AND CONDITIONS** |

prevail.

49. RIGHT TO AUDIT
AIR will have the right at any reasonable time to send its authorized representatives to examine and audit all pertinent documents and materials in the possession or under the control of Supplier relating to any of Supplier's obligations under this Order or any payments requested by Supplier pursuant to this Order. Supplier shall maintain all pertinent books and records relating to this Order in accordance with generally accepted accounting principles consistently applied, and shall keep the books and records (i) for a period of three years after completion of services or delivery of Supplies pursuant to that Order, or (ii) the maximum period required by applicable law, whichever period is greater..

50. SURVIVAL
The following Sections continue to apply after termination of this Order: EXCLUSIVITY; WARRANTY; RECALL CAMPAIGN; INTELLECTUAL PROPERTY; TECHNICAL INFORMATION DISCLOSED TO SELLER; TECHNICAL INFORMATION DISCLOSED TO BUYER; INDEMNIFICATION; RESOLUTION OF DISPUTES; REMEDIES; SETOFF/RECOUPMENT; RIGHT TO AUDIT; GOVERNING LAW; JURISDICTION; ENTIRE AGREEMENT

51. ENTIRE AGREEMENT
This order, together with the attachments, exhibits or supplements, or other terms of Buyer, specifically referenced in this order, constitutes the entire agreement between Supplier and Buyer with respect to the matters contained herein and supersedes all prior oral or written representations and agreements.  This order may only be modified by a purchase order amendment issued by Buyer.

**EXHIBIT 2**



**Air International**
**Thermal Systems**
空调国际热能系统

Air International (US), Inc.
750 Standard Parkway
Auburn Hills, MI 48326

Date: Dec 25 2020

Subject: Letter of Intent (LOI) for HVAC – Inner Condenser Pipe Asm AND Evap Pipe Sub Asm
Project Name & Code: GL091571    Project P2 AUX HVAC

PXI Automotive Mexico S de R.L. de CV
Carretera Estalal 431 2+200 Lote 9-1
El Marques, Querétaro México C.P. 76246

This Letter of Intent is to nominate <u>PXI Automotive</u> as the series supplier for <u>Program P2 GL091571.</u>

Subject to the General Terms and Conditions attached hereto and incorporated by reference herein, Air International (US), Inc. (AIUS) has selected <u>PXI Automotive</u> as the supplier for the <u>Inner Condenser Pipe Asm AND Evap Pipe Sub Asm</u> in connection with the <u>GL091571 Project P2 AUX HVAC</u>. The purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier as follows:

<u>Terms and Conditions</u>
The AIUS's Purchasing General Terms and Conditions (the "General Terms and Conditions"), attached hereto as Annex I and incorporated by reference herein, as such General Terms and Conditions may be amended from time to time, shall be applicable and made part of this Letter of Intent. No variations or other terms and conditions are binding between the parties unless otherwise agreed in writing. Supplier Name must be globally competitive for the products listed on this document over the lifetime of this project. Any commitment made by us in this document will become invalid if <u>PXI Automotive</u> **does** not comply correctly with our Technical and Quality requirements. AIUS reserves the right not to continue with sourcing or to remove this business for any reason at anytime
- Air International document USPUPD0031 Purchase Order Terms and Conditions
- Air International document GLQAMA0101 Supplier Quality Manual
- Air International document USPUMA0027 Purchasing Standards for Suppliers

<u>Contract</u>
Solely for the purpose of this Letter of Intent, the term "Contract" as used or referred to in the General Terms and Conditions shall be interpreted to include this Letter of Intent.

<u>Product and Services of Supplier</u>
- Product and Process Development - Including Tooling and Equipment
- Packaging is included in the piece price.
- Delivery Incoterms
- Supplier is responsible for service requirements up to 10 years after End of Production date. Supplier must hold production piece price for 5 years from end of production date.
- AIUS's customer requirement for warranty will be passed on to the Supplier.

<u>Engineering Capacities</u>
To ensure adequate design and manufacturing support, the Supplier shall continuously ensure that a proper engineering staff is available to support this Project.

USPUFM0097.007



**Air International
Thermal Systems**
空调国际热能系统

Development Costs

Supplier understands and agrees that it will carry its own costs incurred and will not issue invoices to AIUS during the development phase of the Project, including but not limited to costs associated with PPAP documentation, feasibility studies, simulation analyses, engineering meetings, etc.  AIUS will not pay for such costs incurred during the development phase of the Project until subsequent to PPAP approval and receipt of payment by (Company) from its customer.

Tooling Cost and Payment Terms

| Part No. | Drawing Revision Level | PCS Per HVAC | Part Description | Tooling Cost | LEAD TIME | PAYMENT TERMS |
|---|---|---|---|---|---|---|
| P101571088 | .001 | 1 | Inner Condenser Pipe  Asm | $31,500.00 | 8 weeks | PPAP Approval |
| H111571087 | .001 | 1 | Evap Pipe Sub Asm | $21,500.00 | 8 weeks | PPAP Approval |

Quoted price includes  **PXI Automotive to** be in accordance to OEMs specifications per RFQ unless there is written approval from AIUS. Quoted price includes all technical and dimensional information per drawing(s).

Agreed tooling costs will be reimbursed by AIUS, as follows: 100% PPAP Approval. Supplier will send an updated bi-weekly tooling progress report to the program team identified by AIUS. Replacement and maintenance of tooling, or associated gauges and fixtures, will be at the Supplier's cost during the entire lifetime of the Project and 15 years thereafter, unless otherwise mutually agreed in writing.

| Pre-Series: GL091571  Project P2 AUX HVAC HVAC | | | |
|---|---|---|---|
| Build Event | MRD | Quantity | Quality Generation |
| First Build (RC1) | 11/10/2020 | 26  Vehicles | Saleable |
| Second  Build (RC1) | 12/01/2020 | 19 Vehicles | Saleable |
| PPAP OEM Requirement | 12/15/2020 | 6 pc | Non-Saleable |
| Pilot | 1/20/2021 | 500 sets | Saleable |
| Customer SOP – AIUS 2 weeks Prior | 02/01/2021 | 1000 sets | Saleable |

| Part Number | Drawing Revision Level | Part Description | Piece Price | Packaging Cost Included In Piece Price | Delivery Terms | Payment Terms |
|---|---|---|---|---|---|---|
| P101571088 | .001 | Inner Condenser Pipe  Asm | $5.6604 | Included | ExWorks | Net 60 days |
| H111571087 | .001 | Evap Pipe Sub Asm | $4.8260 | Included | ExWorks | Net 60 days |

- Exchange Rate Clause:  Based on 6.8 RMB to 1 USD – to be updated every 6 months. If changes fluctuate more than+/-5%.
- Material Adjustment Clause:  Raw material is based on 1.82 USD/kg, if changes fluctuate more than+/-5% the price will be adjusted accordingly past 6 month's average parameter.
- LTA(s):  N/A
- Mfg. Location of Production Parts: Querétaro México
- Ship from Location:  Querétaro México
- Delivery Terms:  EXWORKS Querétaro México
- MOQ:  2000 PCS EACH PART NUMBER

**TOOLS WILL BE BUILT IN CHINA THEN SHIPPED TO MEXICO**

Supplier shall promptly inform the responsible Senior Commodity Buyer in writing about any impact in terms of pricing and/or time of performance, including Supplier's ability to meet the specifications, materials,

USPUFM0097.007



**Air International**
**Thermal Systems**
空调国际热能系统

packaging, time or method of shipment, or similar requirements.  Supplier shall only proceed with implementing the change(s) after obtaining written confirmation from the responsible Senior Commodity Buyer.

| Project P2  HVAC North America  Estimated Volume | |
|---|---|
| Volume | 2,000 Vehicles |
| Annual | 96,000 Vehicles |
| MPA (+15%) | 110,400 Vehicles |
| Weekly | 2,000  Vehicles |
| MPW (+15%) | 2,300  Vehicles |
| Daily | 400  Vehicles |
| MPD (+15%) | 460  Vehicles |

*Maximum Production Annual (MPA); Maximum Production Weekly (MPW); Maximum Production Daily (MPD); Suppliers shall demonstrate run at rate capacity to support the required annual, weekly and daily production capacities per VDA6.3, AIAG and **AIUS**, SRM requirements.

***Pre-Series sample requirements shall be supplied at production prices and support the appropriate quality generation level specific for VFF, PVS, 0-Series and SOP Production Readiness unless otherwise agreed with **AIUS**, Commodity Buyer. If any delivered Pre-series parts do not meet product requirements, AIUS must be informed in advance to provide a deviation accepting them as reported.  If Pre-series parts are found to be out of specifications and no prior notification was made, AIUS may pursue certified replacement parts at supplier's cost and cost recovery of revalidation costs (DV & PV).

| Pre-Series Quality Requirements | |
|---|---|
| FIRST SHOTS, PVS | Single Cavity Tooling: Minimum 5 sets full dimensional layout |
| | Multi-Cavity Tooling: Minimum 3 sets full dimensional layout per cavity |
| 0-Series/PPAP | Full Production Part Approval Process (PPAP) Submission per AIUS |
| | Single Cavity Tooling: Minimum 6 sets full dimensional layout |
| | Multi-Cavity Tooling: Minimum 3 sets full dimensional layout per cavity |

* Data and measured parts shall be number sequenced with traceability to the dimensional layout report; sequenced parts shall be supplied to **AIUS**, with Pre-Series part submissions.

<u>Annual productivity</u>

N/A

<u>Entire Agreement</u>

This Letter of Intent together with the General Terms and Conditions and all Annexes and other attachments incorporated herein by reference, form the total agreement between <u>**AIUS and Supplier**</u> with respect to the subject matter thereof.  In the event of a conflict between the terms and conditions of this Letter of Intent and the General Terms and Conditions, the terms and conditions of this Letter of Intent and any Purchase Orders for Tooling and or Series Parts shall govern and control. This Letter of Intent is valid with the understanding that supplier will cooperate with **AIUS**, in finalizing all Pre-Sourcing requirements, including the pre-sourcing meeting and technical design review, if applicable, once these have been completed, a Purchase Order will be issued accordingly. Purchase orders for tooling and series parts will be the final contract.

USPUFM0097.007



**Warranty**

Supplier is to provide a warranty period of 48 months from the delivery of parts per our customer's requirements.

To show your agreement to the contents of this Letter of Intent and its Annexes, we kindly request you to sign it and also to initial each Annex and return one complete executed copy of these documents to show your agreement within 2 days after receipt.

| Air International (US), Inc. | PXI Automotive |
|---|---|
| Date:  02/12/2021 | Date: 2021-2-22        2021-02-23 |
| Name:  Teresa Camaj | Name: Peggy Mei |
| Signature:  Tcamaj | Signature: Peggy Mei |

USPUFM0097.007

**EXHIBIT 3**



**Air International Thermal Systems**
空调国际热能系统

Air International (US), Inc.
750 Standard Parkway
Auburn Hills, MI 48326

Date: **June 09 2021**

Subject: Letter of Intent (LOI) for Pipes
Project Name & Code: **FM091595 FORD P708 F250/350 HD Trucks WTOC**

PXI Automotive Mexico S de R.L. de CV
Carretera Estalal 431 2+200 Lote 9-1
El Marques, Querétaro México C.P. 76246

This Letter of Intent is to nominate **PXI AUTOMOTIVE MEXICO (PXI)** as the series supplier for Program(s).

Subject to the General Terms and Conditions attached hereto and incorporated by reference herein, Air International (US), Inc. (AIUS) has selected **PXI AUTOMOTIVE MEXICO** as the supplier for the PIPES ON P708 PROGRAM. The purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier as follows:

<u>**Terms and Conditions**</u>
The AIUS's Purchasing General Terms and Conditions (the "General Terms and Conditions"), attached hereto as Annex I and incorporated by reference herein, as such General Terms and Conditions may be amended from time to time, shall be applicable and made part of this Letter of Intent. No variations or other terms and conditions are binding between the parties unless otherwise agreed in writing. Supplier Name must be globally competitive for the products listed on this document over the lifetime of this project. Any commitment made by us in this document will become invalid if **PXI** does not comply correctly with our Technical and Quality requirements. AIUS reserves the right not to continue with sourcing or to remove this business for any reason at anytime, but all the cancellation must be agreed with PXI, and stocks need fully consumed.

- Air International document USPUPD0031 Purchase Order Terms and Conditions
- Air International document GLQAMA0101 Supplier Quality Manual
- Air International document USPUMA0027 Purchasing Standards for Suppliers
- Air International document MXQAFM0024 Quality Agreement with Suppliers

<u>**Contract**</u>
Solely for the purpose of this Letter of Intent, the term "Contract" as used or referred to in the General Terms and Conditions shall be interpreted to include this Letter of Intent.

<u>**Product and Services of Supplier**</u>
- Product and Process Development - Including Tooling and Equipment
- Packaging is included in the piece price.
- Delivery Incoterms
- Supplier is responsible for service requirements up to 10 years after End of Production date. Supplier must hold production piece price for 5 years from end of production date.
- AIUS's customer requirement for warranty will be passed on to the Supplier.

<u>**Engineering Capacities**</u>
To ensure adequate design and manufacturing support, the Supplier shall continuously ensure that a proper engineering staff is available to support this Project.

<u>**Development Costs**</u>
Supplier understands and agrees that it will carry its own costs incurred and will not issue invoices to AIUS during the development phase of the Project, including but not limited to costs associated with PPAP documentation, feasibility studies, simulation analyses, engineering meetings, etc. AIUS will not pay for such

USPUFM0097.008



**Air International**
**Thermal Systems**
空调国际热能系统

costs incurred during the development phase of the Project until subsequent to PPAP approval and receipt of payment by (Company) from its customer.

**Tooling Cost and Payment Terms**

| Part No. | Drawing Revision Level | Part Description | Tooling Cost | Lead Time to First Shots | Payment Terms |
|---|---|---|---|---|---|
| P181595040 | 001 | Oil Pipe Inlet Asm | $9,880.00 | 9-10 WEEKS | NET 60 DAYS AFTER PPAP APPROVAL ASSUMPTION TOOLS WILL BE SHIPPED TO MEXICO BY SEA |
| P181595041 | 002 | Oil Pipe Outlet Asm | $9,850.00 | 9-10 WEEKS | |
| P181595057 | 001 | Oil Pipe Inlet Asm | $9,850.00 | 9-10 WEEKS | |
| P181595060 | 003 | Oil Pipe Inlet Asm | $9,900.00 | 9-10 WEEKS | |
| P181595062 | 002 | Oil Pipe Outlet Asm | $9,850.00 | 9-10 WEEKS | |
| P181595064 | 002 | Oil Pipe Outlet Asm | $9,900.00 | 9-10 WEEKS | |

Quoted price includes **PXI** to be in accordance to OEMs specifications per RFQ unless there is written approval from AIUS. Quoted price includes all technical and dimensional information per drawing(s).

Agreed tooling costs will be reimbursed by AIUS, as follows: 100% PPAP Approval. Supplier will send an updated bi-weekly tooling progress report to the program team identified by AIUS. Replacement and maintenance of tooling, or associated gauges and fixtures, will be at the Supplier's cost during the entire lifetime of the Project and 15 years thereafter, unless otherwise mutually agreed in writing.

| Part Number | Drawing Revision Level | Part Description | Piece Price | Packaging Cost Included In Piece Price | Delivery Terms | Payment Terms |
|---|---|---|---|---|---|---|
| P181595040 | 001 | Oil Pipe Inlet Asm | $1.643 | Yes | EXW PXI MX | Net 60 days |
| P181595041 | 002 | Oil Pipe Outlet Asm | $1.353 | Yes | EXW PXI MX | Net 60 days |
| P181595057 | 001 | Oil Pipe Inlet Asm | $1.684 | Yes | EXW PXI MX | Net 60 days |
| P181595060 | 003 | Oil Pipe Inlet Asm | $1.723 | Yes | EXW PXI MX | Net 60 days |
| P181595062 | 002 | Oil Pipe Outlet Asm | $1.704 | Yes | EXW PXI MX | Net 60 days |
| P181595064 | 002 | Oil Pipe Outlet Asm | $1.823 | Yes | EXW PXI MX | Net 60 days |

- Exchange Rate Clause: FX is based on 6.7CNY. Will be adjusted every 6 months if changes fluctuate more than +/- 5%.
- Material Adjustment Clause: Raw Material based on 1.9$/kg. Will be adjusted every 6 months if changes fluctuate more than +/- 5%.
- LTA(s): N/A
- Mfg. Location of Production Parts: Querétaro México
- Ship from Location: Querétaro México
- Delivery Terms: EXWORKS PXI Querétaro México
- MOQ: 5000 pieces

Supplier shall promptly inform the responsible Senior Commodity Buyer in writing about any impact in terms of pricing and/or time of performance, including Supplier's ability to meet the specifications, materials, packaging, time or method of shipment, or similar requirements.  Supplier shall only proceed with 9-Buyer.



**Air International
Thermal Systems
空调国际热能系统**

| FM091595 FORD P708 AUBURN HILLS MICHIGAN | |
|---|---|
| **Part No.** | **PIECES** |
| P181595040 | 99,284 |
| P181595041 | 99,284 |
| P181595057 | 88,389 |
| P181595060 | 115,025 |
| P181595062 | 88,389 |
| P181595064 | 115,025 |

*Maximum Production Annual (MPA); Maximum Production Weekly (MPW); Maximum Production Daily (MPD); Suppliers shall demonstrate run at rate capacity to support the required annual, weekly and daily production capacities per VDA6.3, AIAG and **AIUS**, SRM requirements.   **Supplier should be able to support 15% above quoted capacity.**

| Pre-Series FM091595 FORD P708 F250/350 HD Trucks WTOC AUBURN HILLS MICHIGAN | | | |
|---|---|---|---|
| **Build Event** | **MRD** | **Quantity** | **Quality Generation** |
| Vehicle First Fulfillment (VFF) | September 2021 | TBD | Note 6 |
| PVS | October 2021 | 300 pieces each | Note 1 |
| 0-Series/PPAP | NOV 2021 | 6 PCS EACH | Note 1 |
| Ramp Up | OCTOBER 2022 | PER RELEASE | Note 1 |
| SOP | NOVEMBER 2022 | PER RELEASE | Note 1 |

***Pre-Series sample requirements shall be supplied at production prices and support the appropriate quality generation level specific for VFF, PVS, 0-Series and SOP Production Readiness unless otherwise agreed with **AIUS**, Commodity Buyer. If any delivered Pre-series parts do not meet product requirements, AIUS must be informed in advance to provide a deviation accepting them as reported.  If Pre-series parts are found to be out of specifications and no prior notification was made, AIUS may pursue certified replacement parts at supplier's cost and cost recovery of revalidation costs (DV & PV).

| Pre-Series Quality Requirements | |
|---|---|
| VFF, PVS | **Single Cavity Tooling:** Minimum 5 sets full dimensional layout **Multi-Cavity Tooling:** Minimum 3 sets full dimensional layout per cavity |
| 0-Series/PPAP | **Full Production Part Approval Process (PPAP) Submission per AIUS** **Single Cavity Tooling:** Minimum 6 sets full dimensional layout **Multi-Cavity Tooling:** Minimum 3 sets full dimensional layout per cavity |

* Data and measured parts shall be number sequenced with traceability to the dimensional layout report; sequenced parts shall be supplied to **AIUS**, with Pre-Series part submissions.

**Annual productivity**

Supplier commits to an annual price reduction of 0% starting in year two for a three-year period. Further reductions will be mutually agreed after such period.

**Entire Agreement**

This Letter of Intent together with the General Terms and Conditions and all Annexes and other attachments incorporated herein by reference, form the total agreement between **AIUS and** Supplier with respect to the subject matter thereof.  In the event of a conflict between the terms and conditions of this Letter of Intent and the General Terms and Conditions, the terms and conditions of this Letter of Intent and any Purchase Orders for Tooling and or Series Parts shall govern and control. This Letter of Intent is valid with the understanding



**Air International**
**Thermal Systems**
空调国际热能系统

that supplier will cooperate with **AIUS,** in finalizing all Pre-Sourcing requirements, including the pre-sourcing meeting and technical design review, if applicable, once these have been completed, a Purchase Order will be issued accordingly. Purchase orders for tooling and series parts will be the final contract.

To show your agreement to the contents of this Letter of Intent and its Annexes, we kindly request you to sign it and also to initial each Annex and return one complete executed copy of these documents to show your agreement within 2 days after receipt.

Air International (US), Inc.                                PXI Automotive Mexico S de R.L. de CV

**Date:**  July 06  2021                                   **Date:**  07/06/21

**Name: Buyer**   Teresa Camaj                          **Name: Supplier**  Fernando Gomez

**Signature:**                                            **Signature:**

    Tcamaj

USPUFM0097.008

**EXHIBIT 4**



**Air International**
**Thermal Systems**
空调国际热能系统

Air International (US), Inc.
750 Standard Parkway
Auburn Hills, MI 48326

Date: **September 28, 2021**

Subject: Letter of Intent (LOI) for HVAC Pipes
Project Name & Code:  FM091537 Ford GE2

PXI Automotive Mexico S de R.L. de CV
Carretera Estalal 431 2+200 Lote 9-1
El Marques, Querétaro México C.P. 76246

This Letter of Intent is to nominate **PXI AUTOMOTIVE MEXICO (PXI)** as the series supplier for FM091537 Ford GE2 Program(s).

Subject to the General Terms and Conditions attached hereto and incorporated by reference herein, Air International (US), Inc. (AIUS) has selected **PXI AUTOMOTIVE MEXICO**  as the supplier for the PIPES ON **FM091537 Ford GE2 PROGRAM.**  The purpose of this Letter of Intent is to provide the production and tooling prices and other commercial requirements relating to the Project to Supplier as follows:

**Terms and Conditions**

The AIUS's Purchasing General Terms and Conditions (the "General Terms and Conditions"), attached hereto as Annex I and incorporated by reference herein, as such General Terms and Conditions may be amended from time to time, shall be applicable and made part of this Letter of Intent. No variations or other terms and conditions are binding between the parties unless otherwise agreed in writing.  Supplier Name must be globally competitive for the products listed on this document over the lifetime of this project. Any commitment made by us in this document will become invalid if **PXI** does not comply correctly with our Technical and Quality requirements. AIUS reserves the right not to continue with sourcing or to remove this business for any reason at anytime

- Air International document USPUPD0031 Purchase Order Terms and Conditions
- Air International document GLQAMA0101 Supplier Quality Manual
- Air International document USPUMA0027 Purchasing Standards for Suppliers
- Air International document MXQAFM0024 Quality Agreement with Suppliers

**Contract**

Solely for the purpose of this Letter of Intent, the term "Contract" as used or referred to in the General Terms and Conditions shall be interpreted to include this Letter of Intent.

**Product and Services of Supplier**

- Product and Process Development - Including Tooling and Equipment
- Packaging is included in the piece price.
- Delivery Incoterms
- Supplier is responsible for service requirements up to 10 years after End of Production date. Supplier must hold production piece price for 5 years from end of production date.
- AIUS's customer requirement for warranty will be passed on to the Supplier.

**Engineering Capacities**

To ensure adequate design and manufacturing support, the Supplier shall continuously ensure that a proper engineering staff is available to support this Project.

USPUFM0097.008



**Air International**
**Thermal Systems**
空调国际热能系统

### Development Costs

Supplier understands and agrees that it will carry its own costs incurred and will not issue invoices to AIUS during the development phase of the Project, including but not limited to costs associated with PPAP documentation, feasibility studies, simulation analyses, engineering meetings, etc.  AIUS will not pay for such

costs incurred during the development phase of the Project until subsequent to PPAP approval and receipt of payment by (Company) from its customer.

### Tooling Cost and Payment Terms

| Part No. | Drawing Revision Level | Part Description | Tooling Cost | Lead Time to First Shots | Payment Terms |
|---|---|---|---|---|---|
| H321537021 | .004 | PIPE HEATER INLET | $7,692.00 | 8 WEEKS | NET 60 DAYS AFTER PPAP APPROVAL ASSUMPTION TOOLS WILL BE SHIPPED TO MEXICO BY SEA |
| H321537022 | .004 | PIPE HEATER OUTLET | $7,692.00 | 8 WEEKS | |
| H321537023 | .004 | PIPE – EVAPORATOR INLET | $6,210.00 | 8 WEEKS | |
| H321537024 | .004 | PIPE EVAPORATOR OUTLET | $6,210.00 | 8 WEEKS | |

Quoted price includes **PXI** to be in accordance to OEMs specifications per RFQ unless there is written approval from AIUS. Quoted price includes all technical and dimensional information per drawing(s).

Agreed tooling costs will be reimbursed by AIUS, as follows: 100% PPAP Approval. Supplier will send an updated bi-weekly tooling progress report to the program team identified by AIUS. Replacement and maintenance of tooling, or associated gauges and fixtures, will be at the Supplier's cost during the entire lifetime of the Project and 15 years thereafter, unless otherwise mutually agreed in writing.

| Part Number | Drawing Revision Level | Part Description | Piece Price | Packaging Cost Included In Piece Price | Delivery Terms | Payment Terms |
|---|---|---|---|---|---|---|
| H321537021 | .004 | PIPE HEATER INLET | $1.4949 | Yes | EXW PXI MX | Net 60 days |
| H321537022 | .004 | PIPE HEATER OUTLET | $1.7523 | Yes | EXW PXI MX | Net 60 days |
| H321537023 | .004 | PIPE – EVAPORATOR INLET | $0.5742 | Yes | EXW PXI MX | Net 60 days |
| H321537024 | .004 | PIPE EVAPORATOR OUTLET | $0.6138 | Yes | EXW PXI MX | Net 60 days |

- Exchange Rate Clause: FX is based on 6.65 CNY. Will be adjusted every 6 months if changes fluctuate more than +/- 5%.
- Material Adjustment Clause: Raw Material based on $2.02/kg. Will be adjusted every 6 months if changes fluctuate more than +/- 5%.  RM is based on SME market
- LTA(s): N/A
- Mfg. Location of Production Parts: Querétaro México
- Ship from Location: Querétaro México
- Delivery Terms: EXWORKS PXI Querétaro México
- MOQ: 5000 pieces

Supplier shall promptly inform the responsible Senior Commodity Buyer in writing about any impact in terms of pricing and/or time of performance, including Supplier's ability to meet the specifications, materials, packaging, time or method of shipment, or similar requirements.  Supplier shall only proceed with 9-Buyer.

| FM091537 Ford GE2 PUEBLA MEXICO | |
|---|---|
| **Part No.** | **PIECES** |
| H321537021 | 100,000 |
| H321537022 | 100,000 |
| H321537023 | 100,000 |
| H321537024 | 100,000 |

USPUFM0097.008



**Air International**
**Thermal Systems**
空调国际热能系统

\*Maximum Production Annual (MPA); Maximum Production Weekly (MPW); Maximum Production Daily (MPD); Suppliers shall demonstrate run at rate capacity to support the required annual, weekly and daily production capacities per VDA6.3, AIAG and **AIUS,** SRM requirements.   **Supplier should be able to support 15% above quoted capacity.**

| Pre-Series FM091537 Ford GE2 PUEBLA MEXICO | | | |
|---|---|---|---|
| Build Event | MRD | Quantity | Quality Generation |
| DV Testing | October 2021 (AH Michigan) | 50 pcs | Production Design / Production Materials |
| DCV | March 02 2022 (Mexico) | 300 pcs | Production Design / Production Material DV test approved |
| 0-Series/PPAP | Sep 2022 | 6 pcs | Note 1 – Per drawing |
| Ramp Up | April 2023 | PER RELEASE | Note 1 – Per drawing |
| SOP | June 2023 | PER RELEASE | Note 1 – Per drawing |

Supplier Note: PXI Can't meet Oct 2021 due date for DV. We will try to reach end of November 2021; this is due to late kick off of this project. Additionally, event: DV and DCV have an incoterm of ExWrks PXI CN.

\*\*\*Pre-Series sample requirements shall be supplied at production prices and support the appropriate quality generation level specific for VFF, PVS, 0-Series and SOP Production Readiness unless otherwise agreed with **AIUS,** Commodity Buyer. If any delivered Pre-series parts do not meet product requirements, AIUS must be informed in advance to provide a deviation accepting them as reported.  If Pre-series parts are found to be out of specifications and no prior notification was made, AIUS may pursue certified replacement parts at supplier's cost and cost recovery of revalidation costs (DV & PV).

| Pre-Series Quality Requirements | |
|---|---|
| VFF, PVS | **Single Cavity Tooling:** Minimum 5 sets full dimensional layout |
| | **Multi-Cavity Tooling:** Minimum 3 sets full dimensional layout per cavity |
| 0-Series/PPAP | **Full Production Part Approval Process (PPAP) Submission per AIUS** |
| | **Single Cavity Tooling:** Minimum 6 sets full dimensional layout |
| | **Multi-Cavity Tooling:** Minimum 3 sets full dimensional layout per cavity |

 \* Data and measured parts shall be number sequenced with traceability to the dimensional layout report; sequenced parts shall be supplied to **AIUS,** with Pre-Series part submissions.

**Annual productivity**

Supplier commits to an annual price reduction of 0% starting in year two for a three-year period. Further reductions will be mutually agreed after such period.

**Entire Agreement**

This Letter of Intent together with the General Terms and Conditions and all Annexes and other attachments incorporated herein by reference, form the total agreement between **AIUS and** Supplier with respect to the subject matter thereof.  In the event of a conflict between the terms and conditions of this Letter of Intent and the General Terms and Conditions, the terms and conditions of this Letter of Intent and any Purchase Orders for Tooling and or Series Parts shall govern and control. This Letter of Intent is valid with the understanding that supplier will cooperate with AIUS, in finalizing all Pre-Sourcing requirements, including the pre-sourcing meeting and technical design review, if applicable, once these have been completed, a Purchase Order will be issued accordingly. Purchase orders for tooling and series parts will be the final contract.

To show your agreement to the contents of this Letter of Intent and its Annexes, we kindly request you to sign it and also to initial each Annex and return one complete executed copy of these documents to show your agreement within 2 days after receipt.

Air International (US), Inc.                                    PXI Automotive Mexico S de R.L. de CV



**Air International**
**Thermal Systems**
空调国际热能系统

Date: 10/06/2021

Date: 10/06/2021

Name: Buyer

Name: Supplier  PXel Automotive Mexico

Signature:

Signature:

*Tcamaj*

*Fernando Gomez Head of Sales North America*

USPUFM0097.008

**EXHIBIT 5**



Date: January 20th, 2020

Subject: Letter of Intent (LOI) for **Pipes**
Project Name & Code:  **Ford CD390/539 Pipes**

**PXI Automotive México S de RL de CV
Carretera Estatal 431 Km 2+200 Lote 9-1 Módulo 3
Parque Industrial Tecnológico Inovación
El Marques, Querétaro. Mexico
C.P. 76246**

This Letter of Intent is to nominate **PXI Automotive México S de RL de CV**
as the series supplier for Program(s).  **Ford CD390/539 Pipes**

Subject to the General Terms and Conditions attached hereto and incorporated by reference herein, Air
Thermal Systems S de RL de CV. (AIMX) has selected **PXI Automotive México S de RL de CV.** as the
supplier for **Ford CD390/539 Pipes**. The purpose of this Letter of Intent is to provide the production and
tooling prices and other commercial requirements relating to the Project to Supplier as follows:

**Terms and Conditions**
The AIMX's Purchasing General Terms and Conditions (the "General Terms and Conditions"), attached hereto
as Annex I and incorporated by reference herein, as such General Terms and Conditions may be amended
from time to time, shall be applicable and made part of this Letter of Intent. No variations or other terms and
conditions are binding between the parties unless otherwise agreed in writing.  Supplier Name must be
globally competitive for the products listed on this document over the lifetime of this project. Any commitment
made by us in this document will become invalid if **PXI Automotive México S de.RL de CV** does not comply
correctly with our Technical and Quality requirements. AIMX reserves the right not to continue with sourcing
or to remove this
business for any reason at anytime

- Air International document USPUPD0031 Purchase Order Terms and Conditions.
- Air International document GLQAMA0101 Supplier Quality Manual
- Air International document MXSPPR0006 Logistics Agreement
- Air International document MXQAPR0024 Quality Assurance Agreement
- Air International document USPUMA0027 Purchasing Standards for Suppliers

**Contract**
Solely for the purpose of this Letter of Intent, the term "Contract" as used or referred to in the General Terms
and Conditions shall be interpreted to include this Letter of Intent.

**Product and Services of Supplier**
- Product and Process Development - Including Tooling and Equipment
- All parts must meet all the dimensions and technical specification of the print
- Packaging is included in the piece price.

MXSPP0008                                                   Rev. 0 Junio 2019

 Air International

<u>Engineering Capacities</u>
To ensure adequate design and manufacturing support, the Supplier shall continuously ensure that a proper engineering staff is available to support this Project.
<u>Development Costs</u>
Supplier understands and agrees that it will carry its own costs incurred and will not issue invoices to AIMX during the development phase of the Project, including but not limited to costs associated with PPAP documentation, feasibility studies, simulation analyses, engineering meetings, etc. AIMX will not pay for such costs incurred during the development phase of the Project until subsequent to PPAP approval and receipt of payment by (Company) from its customer.

<u>Tooling Cost and Payment Terms</u>

| Part No. | Drawing Revision Level | Part Description | Tooling Cost | Lead Time to First Shots | Payment Terms |
|---|---|---|---|---|---|
| P09_1539_105 | 002 | Pipe Inlet | USD 2,836.33 | Week 17/2020 | 50% with Order |
| P09_1539_106 | 002 | Pipe Outlet | USD 2,836.33 | Week 17/2020 | 30% First samples |
| P09_1539_118 | 002 | Pipe Outlet | USD 2,836.33 | Week 17/2020 | 20% PPAP |

Quoted price includes PXI Automotive México S de RL de CV to be in accordance to OEMs specifications per RFQ unless there is written approval from AIMX. Quoted price includes all technical and dimensional information per drawing(s).

Agreed tooling costs will be reimbursed by AIMX, as follows: 50% with Order, 30% First Samples, 20% PPAP Approval. Supplier will send an updated bi-weekly tooling progress report to the program team identified by AIMX. Replacement and maintenance of tooling, or associated gauges and fixtures, will be at the Supplier's cost during the entire lifetime of the Project and 10 years thereafter, unless otherwise mutually agreed in writing.

| Part Number | Drawing Revision Level | Part Description | Piece Price | Packaging Cost Included in Piece Price | Incoterms | Payment Terms |
|---|---|---|---|---|---|---|
| P09_1539_105 | 002 | Pipe Inlet | USD 0.49 | Yes | EXW | Net 60 days |
| P09_1539_106 | 002 | Pipe Outlet | USD 0.45 | Yes | EXW | Net 60 days |
| P09_1539_118 | 002 | Pipe Outlet | USD 0.42 | Yes | EXW | Net 60 days |

Mfg. Location of Production Parts:  PXI Automotive México S de RL de CV / Zip Code 76246

Ship from Location:

- PXI Automotive México S de RL de CV / Zip Code 76246 (AIMX assumes all the expenses and risks inherent in transport, from the departure from the factory to the destination)

MXSPP0008                                                          Rev. 0 Junio 2019



Supplier shall promptly inform the responsible Senior Commodity Buyer in writing about any impact in terms of pricing and/or time of performance, including Supplier's ability to meet the specifications, materials, packaging, time or method of shipment, or similar requirements.   Supplier shall only proceed with implementing the change(s) after obtaining written confirmation from the responsible Senior Commodity Buyer.

| FORD  CD390/539 AIMX Capacity Requirement Estimated Vehicle sets | | | | |
|---|---|---|---|---|
| Part Number | Description | APW | MPW | MPA (Max production annual) |
| P09_1539_105 | Pipe Inlet | 525 | 578 | 27,744 |
| P09_1539_106 | Pipe Outlet | 525 | 578 | 27,744 |
| P09_1539_118 | Bracket | 525 | 578 | 27,744 |

Lifetime of the program: 3.75 years
(MPD); Suppliers shall demonstrate run at rate capacity to support the required annual, weekly and daily production capacities per VDA6.3, AIAG and AIMX, SRM requirements.

AIMX reserves the right to submit a Release Program in weekly basis that should be acknowledged by the supplier.  The terms of this Release Program are subject to the following rules:
Firm Week :      First 2 weeks
Forecast Week:   12 weeks

| Ford CX430 AIMX Capacity Requirement Estimated Vehicle Sets | | | |
|---|---|---|---|
| Build Event | MRD | Quantity | Quality Generation |
| First Shots | March 9th, 2020 | 600 sets | Dimensionally Correct 5 pieces full dimensional layout per cavity |
| TT - Builds | April 13th, 2020 | 600 sets | PPAP Approved |
| PP - Event | July 30th, 2020 | EDI release | PPAP Approved |
| Ramp Up | October 5th  2020 | EDI release | PPAP Approved |
| SOP | November 3rd, 2020 | EDI release | PPAP Approved |

### Annual productivity
Supplier commits to an annual price reduction of 0% starting in year two for a three-year period. Further reductions will be mutually agreed after such period.

MXSPP0008                                                Rev. 0 Junio 2019


**Air International**
Thermal Systems

This Letter of Intent together with the General Terms and Conditions and all Annexes and other attachments

subject matter thereof   In the event of a conflict between the terms and conditions of this Letter of Intent and the General Terms and Conditions, the terms and conditions of this Letter of Intent shall govern and control This Letter of Intent is valid with the understanding that supplier will cooperate with AIMX, in finalizing all PreSourcing requirements, including technical design review, if applicable. Once these have been completed, a Purchase Order will be issued accordingly.

To show your agreement to the contents of this Letter of Intent and its Annexes, we kindly request you to sign it and also to initial each Annex and return one complete executed copy of these documents to show your agreement within 2 days after receipt.

Air Thermal Systems S de RL de CV
  Date:   January 20th , 2020

Vendor PXI AUTOMOTIVE MEXICO S DE RL DE CV
            Date:

Name:   Weiyin Zhang

Signature:

Name:   Ing. Enrique Reina

Signature:

Name:   Jose Juventino Castro Renteria

Signature:

Name:

Signature:

2020.212

MXSPP0008

Rev. 0 Junio 2019